[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 17, 2001
THOMAS K. KAHN
CLERK

————————————

No. 00-15005

————————————

D.C. Docket No. 00-00026-CV-HLM-4

NICCIE MCCLENDON,
Individually and as Administrator of
the Estate of Alton McClendon and on
behalf of those similarly situated, BESSIE
HOGAN , individually and on behalf of
those similarly situated, et al.,

Plaintiffs-Appellants,

versus

GEORGIA DEPARTMENT OF COMMUNITY HEALTH,
RUSSELL TOAL, in his official capacity as
Commissioner of the Department of Community Health, et al.,

Defendants-Appellees.

————————————

Appeal from the United States District Court for the
Northern District of Georgia

————————————

**(August 17, 2001)**

Before CARNES, COX and NOONAN[*], Circuit Judges.

CARNES, Circuit Judge:

This lawsuit is an attempt by Medicaid recipients in Georgia who have been injured by the use of tobacco products to obtain from the State a portion of the proceeds that it is due to receive under the $206 billion "Master Settlement Agreement" consummated by the tobacco industry and 46 states in 1998. Georgia is scheduled to receive $4.8 billion under that agreement, and the plaintiffs contend that the Medicaid Act, 42 U.S.C. §§ 1396 et seq., entitles them to some of that money. The defendants, who are various Georgia officials and a State agency, think otherwise. The district court held that the lawsuit was barred by the Eleventh Amendment. We affirm that holding as to the state agency, but do not reach the more difficult issue of whether the Eleventh Amendment bars the lawsuit insofar as the state officials are concerned, because we conclude that it lacks merit anyway.

## I. BACKGROUND

On August 19, 1997, the State of Georgia and two State officials filed suit in the superior court of Fulton County against six cigarette manufacturers and others ("tobacco companies"), alleging that they had "unlawfully shifted the financial

---

[*] Honorable John T. Noonan, Jr., U. S. Circuit Judge for the Ninth Circuit, sitting by designation.

responsibility" to the State for the health care costs attributable to their "addictive, injurious, and unreasonably dangerous products." The complaint contained eleven counts alleging violations of state law and requesting monetary and equitable relief.[1] It sought restitution "in excess of 2.78 billion dollars" for medical assistance that the State estimated it had paid on behalf of Medicaid recipients who suffered from tobacco-related injuries and illnesses.

The lawsuit was settled. On November 23, 1998, Georgia, and 45 other states, entered into an agreement with the Tobacco companies known as the "Master Settlement agreement." As part of that agreement, the tobacco companies agreed to pay Georgia an estimated $4.8 billion over the course of 25 years, with the first payment of $58.9 million coming in December of 1999.

The settlement agreement stipulates that the payments are in settlement of "antitrust, consumer protection, common law negligence, statutory, common law and equitable claims for monetary, restitutionary, equitable and injunctive relief"

---

[1] Specifically, the complaint alleged: (1) violations of Georgia's RICO statute, O.C.G.A. § 16-14-1 et seq.; (2) violations of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372; (3) violations of the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-393; (4) conspiracy; (5) negligence; (6) strict product liability; (7) that the State was entitled to Medicaid reimbursement from the Tobacco companies under O.C.G.A. § 49-4-148 "in excess of 2.78 billion dollars"; (8) that the State was entitled to restitution for its tobacco-related expenses; (9) violation of the Tobacco companies' "special duty" to the public; and (10) fraud and deceit. Count eleven, which contained the prayer for relief, sought various forms of injunctive and compensatory relief.

brought by the settling states against the tobacco companies. It defines "Released

Claims" as follows:

> (1) for past conduct, acts or omissions (including any damages incurred in the future arising from such past conduct, acts, or omissions), those Claims directly or indirectly based on, arising out of or in any way related, in whole or in part, to (A) the use, sale, distribution, manufacture, development, advertising, marketing or health effects of, (B) the exposure to, or (C) research, statements, or warnings regarding, Tobacco Products (including, but not limited to, the Claims asserted in the actions identified in Exhibit D, or any comparable Claims that were, could be or could have been asserted now or in the future in those actions or in any comparable action in federal, state or local court brought by a Settling State or a Releasing Party (whether or not such Settling State or Releasing Party has brought such action)), except for claims not asserted in the actions identified in Exhibit D for outstanding liability under existing licensing (or similar) fee laws or existing tax laws (but not excepting claims for any tax liability of the Tobacco-Related Organizations or of any Released Party with respect to such Tobacco-Related Organizations, which claims are covered by the release and covenants set forth in this Agreement);

> (2) for future conduct, acts or omissions, only those monetary Claims directly or indirectly based on, arising out of or in any way related to, in whole or in part, the use of or exposure to Tobacco Products manufactured in the ordinary course of business, including without limitation any future Claims for reimbursement of health care costs allegedly associated with the use of or exposure to Tobacco Products.

The settlement agreement also defines the "Releasing Parties":

> (pp) "Releasing Parties" means each Settling State and any of its past, present, and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories hereto to release past, present, and future claims, the

4

following: (1) any Settling State's subdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions; and (2) persons or entities acting in a parents patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of the State, as opposed solely to private or individual relief for separate and distinct injuries, or (B) to the extent that any such entity (as opposed to an individual) is seeking recovery of health-care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed, directly or indirectly, by a Settling State.

As the quoted provisions indicate, by entering into the settlement agreement Georgia released its past and future claims against the tobacco companies relating to the manufacture and use of tobacco products, but it did not purport to release private or individual claims based on separate and distinct injuries; those were expressly excepted from release.

The plaintiffs in this case are individuals who suffer or have suffered from a variety of illnesses caused by the use of tobacco products, and who have been recipients of medical assistance payments under Georgia's federally supported Medicaid program. They brought this putative class action in January 27, 2000 on behalf of themselves and others similarly situated, alleging violations of the Medicaid Act and the Fifth and Fourteenth Amendments to the United States

5

Constitution. They contend that federal law, 42 U.S.C. § 1396k(b), entitles them to that amount of the settlement proceeds Georgia is scheduled to receive which exceeds the amount the State has actually expended on medical assistance. The defendants are the Georgia Department of Community Health, which, through its Division of Medical Assistance, is responsible for administering Georgia's Medicaid program,[2] as well as various State officials.

The complaint in this case asks for declaratory and injunctive relief, specifically requesting that orders be issued requiring the defendants "to disburse to the Plaintiffs ... that portion of the tobacco litigation settlement proceeds that belong to the Plaintiffs," and enjoining the defendants "to provide to each and every member of the plaintiff class due process of law concerning all property previously taken," including notice, information and documents regarding each plaintiff's share of the settlement proceeds, and hearings to allow individual plaintiffs to challenge denials of those proceeds. The complaint includes claims that the defendants violated the Medicaid Act, 42 U.S.C. § 1396a(25)(A)-(B), by failing to seek reimbursement from third parties for medical assistance payments made by the State, and that the defendants "have violated and are violating federal

---

[2] The Georgia Department of Community Health has assumed "powers and responsibility with respect to the expenditure of any funds appropriate to the department, including, without being limited to, funds received by the state pursuant to the [settlement agreement.]" O.C.G.A. § 31-5A-4(a).

law" by failing to distribute a portion of the settlement proceeds to the plaintiffs. However, at least before this Court, the plaintiffs have abandoned any claims about past violations of federal law, and insist that they seek only "future compliance with federal law at each future point when the federal law becomes applicable to collected funds." Brief for Appellant at 26, McClendon v. Ga. Dept. of Cmty. Health, ___ F.3d ___ (11th Cir. 2001) (No. 00-15005).

The district court granted the defendants' motion to dismiss on the ground that, under the Eleventh Amendment, the court lacked subject-matter jurisdiction to entertain the plaintiffs' suit.

## II. CONTENTIONS OF THE PARTIES

The plaintiffs contend that notwithstanding the dictates of the Eleventh Amendment, their suit is permissible under the doctrine announced in Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908). The Young doctrine permits federal courts to entertain suits against state officers seeking prospective equitable relief to end continuing violations of federal law. See Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 2000), cert. denied, 120 S. Ct. 1287 (2000) ("Summit Medical"). According to the plaintiffs, the relief they seek is prospective because the defendants will not violate federal law, 42 U.S.C. § 1396k(b), until some time in the future, when Georgia receives settlement proceeds from the

7

tobacco companies in excess of the State's actual medical assistance payments, and unlawfully fails to disburse those excess proceeds to them. The plaintiffs claim that point has not yet been reached and will not be reached until years in the future.

The defendants argue that the district court correctly determined that the Eleventh Amendment bars the plaintiffs' claims because those claims are not for prospective relief, but instead are claims for money damages based on a past violation of federal law. The defendants also argue that, even if the plaintiffs' suit fits within the Ex Parte Young doctrine, it is still barred by the Eleventh Amendment because the relief the plaintiffs seek would infringe on Georgia's "special sovereignty interests" in controlling property received in the settlement of a lawsuit. In the alternative, the defendants argue, the plaintiffs have failed to state a claim upon which relief can be granted. The plaintiffs, of course, maintain that they have stated a valid claim for relief.

## III. DISCUSSION

### A. THE ELEVENTH AMENDMENT

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

8

prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. Amend. XI. Though by its plain terms the Eleventh Amendment only precludes federal courts from entertaining suits against a state brought by citizens of another state, it has been construed to bar suits against a state brought by that state's own citizens as well. See, e.g., Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 121 S. Ct. 955, 961-62 (2001). The Amendment is rooted in the recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 & n.5, 113 S. Ct. 684, 689 & n.5 (1993); Dekalb County Sch. Dist. v. Schrenko, 109 F.3d 680, 688 (11th Cir. 1997). In short, the Eleventh Amendment's ultimate guarantee is that nonconsenting states may not be sued by private individuals in federal court. See Garrett, 531 U.S. 356, 121 S. Ct. at 962; Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 72-73, 120 S. Ct. 631, 640 (2000).

Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 906-07 (1984), federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment.

See Vermont Agency of Natural Res. v. United States, 529 U.S. 765, 778, 120 S.

Ct. 1858, 1865 (2000); Pennhurst, 465 U.S. at 98, 104 S.Ct. at 906 (The

significance of the Eleventh Amendment "lies in its affirmation that the

fundamental principle of sovereign immunity limits the grant of judicial authority

in Art. III.") (internal marks and citation omitted).  In accordance with the

jurisdictional nature of the Eleventh Amendment's limitation on judicial authority,

the Supreme Court has held that the "Eleventh Amendment defense ... need not be

raised in the trial court," Edelman v. Jordan, 415 U.S. 651, 678, 94 S. Ct. 1347,

1363 (1974), and may be raised for the first time by a state on appeal, see Ford

Motor Co. v. Dept. of Treasury, 323 U.S. 459, 467, 65 S. Ct. 347, 352 (1945).

But the jurisdictional bar embodied in the Eleventh Amendment is a "rather

peculiar kind of 'jurisdictional' issue." United States v. SCS Bus. & Tech. Inst.,

Inc., 173 F.3d 890, 892 (D.C. Cir. 1999).  Unlike most  subject matter jurisdiction

issues, which cannot be waived by the parties and  must be raised by a court on its

own initiative, the Eleventh Amendment does not automatically deprive a court of

original jurisdiction.  Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381,

389, 118 S. Ct. 2047, 2052 (1998); see Calderon v. Ashmus, 523 U.S. 740, 745

n.2, 118 S. Ct. 1694, 1697 n.2 (1998) ("While the Eleventh Amendment is

jurisdictional in the sense that it is a limitation on the federal court's judicial

10

power, ... we have recognized that it is not coextensive with the limitations on judicial power in Article III."). "Rather," the Supreme Court has explained, "the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." Schacht, 524 U.S. at 389, 118 S. Ct. at 2052. This understanding of the Eleventh Amendment as a volitional defense is manifest in decisions allowing it to be waived by the state, see, e.g., Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241, 105 S. Ct. 3142, 3146-47 (1985), or ignored by the court if not raised, see, e.g., Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 515 n.19, 102 S. Ct. 2557, 2567, n.19 (1982). Thus, unlike other jurisdictional bars, federal courts are required to consider whether the Eleventh Amendment strips them of jurisdiction only if the state defendant insists that it does.

The Supreme Court's decision in Patsy illustrates the elective nature of the Eleventh Amendment's jurisdictional bar. See 457 U.S. 496, 102 S. Ct. 2557. In that case the defendant, the Board of Regents of the State of Florida, raised an Eleventh Amendment defense in its brief to the original court of appeals panel, and in its response in opposition to the plaintiff's petition for certiorari. See id. at 515 n.19, 102 S. Ct. at 2567 n.19. Although the Eleventh Amendment defense had been raised by the defendant before the case reached that level, the Supreme Court declined to consider whether it barred the plaintiff's suit, explaining that "we have

11

never held that [the Eleventh Amendment] is jurisdictional in the sense that it must be raised and decided by this Court on its own motion." Id. The defendant in Patsy had "expressly requested" that the Court not pass on the State's potential Eleventh Amendment immunity and, consequently, the Court disposed of the case solely on the merits. Id. In doing so, the Court noted that its disposition of the case did not "preclude[] the Board of Regents from raising its Eleventh Amendment claim on remand." Id.

The defendants in this case have put forth two alternative bases for affirming the district court's dismissal of the plaintiffs' claims. They contend that we can dismiss this lawsuit either because the Eleventh Amendment deprives us of jurisdiction to consider it, or because the plaintiffs' complaint fails to state a claim upon which relief can be granted. After summarizing their Eleventh Amendment defense, the defendants stated in their reply brief that "[t]he dismissal of [the plaintiffs'] complaint can also be affirmed on the ground that [their] complaint failed to state a claim upon which relief could be granted." Brief for Appellant at 11, McClendon v. Ga. Dept. of Cmty. Health, ___ F.3d ___ (11th Cir. 2001) (No. 00-15005). At oral argument before this Court, counsel for the defendants stated that "[e]ither [the Eleventh Amendment or the plaintiffs' failure to state a claim] is sufficient basis to affirm [the district court's] decision."

We interpret the defendants' position as a conditional assertion of Eleventh Amendment sovereign immunity – they insist upon that defense only if it is necessary to prevent judgment against them on the merits. In other words, the defendants are willing to withhold the assertion of the Eleventh Amendment provided that our disposition of the merits issue is favorable to them. Only if we are going to decide the merits issue against them do they insist upon a ruling on the Eleventh Amendment issue. Because the Eleventh Amendment "grants the State a legal power to assert a sovereign immunity defense should it choose to do so," Schacht, 524 U.S. at 389, 118 S. Ct. at 2052, the defendants are free to conditionally assert that defense in order to allow a federal court to decide in their favor on the merits. Accord United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc., 173 F.3d 890, 893 (D.C. Cir. 1999); Parella v. Ret. Bd., 173 F.3d 46, 53-57 (1st Cir. 1999); see also Floyd v. Thompson, 227 F.3d 1029, 1035 (7th Cir. 2000). But see United States v. Tex. Tech Univ., 171 F.3d 279 (5th Cir. 1999) (holding that federal courts must consider Eleventh Amendment defense before addressing merits).[1]

---

[1] The defendants are represented by Georgia's Attorney General. In Lapides v. Board of Regents, 251 F.3d 1372, 1374-76 (11th Cir. 2001), we held that Georgia's Attorney General does not possess the authority to waive the State's Eleventh Amendment immunity from suit. But that case dealt with an unconditional waiver of the Eleventh Amendment, not the conditional assertion of it. Accordingly, the holding of Lapides is not controlling here.

13

The proposition that a federal court may consider the merits before determining the applicability of an Eleventh Amendment immunity defense when a state invites it to do so may appear to conflict with our decision in Seaborn v. Florida, 143 F.3d 1405 (11th Cir. 1998), but we do not believe there is a conflict when the holding of that case is limited to the circumstances that gave rise to it. In Seaborn, we did say that "an assertion of Eleventh Amendment immunity must be resolved before a court may address the merits of the underlying claim(s)." Id. at 1407 (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-101, 118 S. Ct. 1003, 1012-16 (1998)).[2] However, in contrast to the defendants here, there is no indication that the defendants in Seaborn expressed a willingness to permit the court to reach the merits instead of considering the Eleventh Amendment issue. Because the defendants in this case have conditionally consented to us bypassing

---

[2] The Supreme Court in Steel Co. rejected the doctrine of "hypothetical jurisdiction," a practice previously adopted by this Court whereby we would hypothetically assume jurisdiction over a case and then proceed to dismiss the case on the merits. See, e.g., Smith v. Avino, 91 F.3d 105, 107 (11th Cir. 1996), abrogated by Steel Co., 523 U.S. at 93-101, 118 S. Ct. at 1012-16. The Court in Steel Co. reasoned that courts should confront jurisdictional questions before delving into the merits of a particular case, because jurisdiction is a "question the court is bound to ask and answer for itself, even when not otherwise suggested ...." Id. at 94, 118 S. Ct. at 1012 (internal marks and citation omitted). Two of our sister circuits have questioned the applicability of Steel Co.'s holding in the context of Eleventh Amendment sovereign immunity. See United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc., 173 F.3d 890, 893-97 (D.C. Cir. 1999) ("[T]he quasi-jurisdictional or 'hybrid' status of the Eleventh Amendment raises questions about Steel Co.'s applicability in this context ....") (citations omitted); Parella v. Ret. Bd., 173 F.3d 46, 54-57 (1st Cir. 1999) ("Eleventh Amendment issues do not fall into the category of Article III questions that Steel Co. would define as necessarily antecedent.").

14

the Eleventh Amendment issue and proceeding directly to the merits, this is a different case than Seaborn. See generally United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.") (quoting, Carnes, J., concurring in United States v. Hunter, 172 F.3d 1307, 1309 (11th Cir. 1999)).

The Seventh Circuit faced virtually identical issues to those we face here, in a lawsuit brought by plaintiffs in the State of Wisconsin seeking part of that State's tobacco settlement proceeds. Floyd v. Thompson, 227 F.3d 1029 (7th Cir. 2000). Recognizing that the Eleventh Amendment issues were "complex," the Court declined to decide them. Instead, explaining "[t]he Supreme Court has indicated that the Eleventh Amendment occupies its own unique territory," the Seventh Circuit concluded that it could sidestep the Eleventh Amendment issues because the claims lacked merit, anyway. Id. at 1035 - 37. We agree that such an approach is permissible, at least where it is invited by the defendants as it is in this case. See generally Patsy, 457 U.S. at 515 n.19, 102 S. Ct. at 2567 n.19 ("[W]e have never held that [the Eleventh Amendment] is jurisdictional in the sense that it must be raised and decided by this Court on its own motion.").

Of course, a state or its officials cannot force a federal court to decide the merits of a claim before addressing the Eleventh Amendment issue, and we can raise an Eleventh Amendment issue on our own motion. Whiting v. Jackson State University, 616 F.2d 116, 126 n.8 (5th Cir. 1980). Our holding is limited to the conclusion that the conditional assertion of the Eleventh Amendment gives a federal court the discretion to dispose of the merits favorably to the state or its officials if it chooses to do so. Given modern caseload burdens, one of the paramount considerations in deciding whether to accept such an invitation will be the difficulty of the Eleventh Amendment issues compared to the merits issues. See Parella, 173 F.3d at 56 ("[A]voiding Eleventh Amendment questions where there are other dispositive issues ... permits courts to avoid squandering judicial resources."). Here, there is nothing difficult about the Eleventh Amendment issue as it relates to the claims against the Georgia Department of Public Health – those claims are clearly barred by the Amendment. See Alabama v. Pugh, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057 (1978). So, we affirm the district court's dismissal of the state agency on that ground. However, the Eleventh Amendment issues involving the state officials, which entail the application of the Ex Parte Young exception, are much thornier. See Floyd, 227 F.3d at 1034-35. The difficulty of those Eleventh Amendment issues, coupled with the fact that the merits issues are open

16

and shut in favor of the defendants, causes us to exercise our discretion to look around the Eleventh Amendment issues involving the state official defendants to the merits.

## B.  FAILURE TO STATE A CLAIM

We begin our discussion of the merits of the plaintiffs' claims with a sketch of the relevant statutory and regulatory provisions that form the basis for those claims.

Medicaid is a cooperative federal and state program designed to finance health care services for the indigent.  It was established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. ("Medicaid Act"), and is administered in Georgia by the Department of Community Health, see O.C.G.A. § 49-4-142(a).  As a voluntary participant in the Medicaid program, Georgia is "obligated to comply with the requirements of the Medicaid Act and corresponding regulations."  Fla. Ass'n. of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1216 n.5 (11th Cir. 2000); see 42 U.S.C. § 1396a; O.C.G.A. § 49-4-157 ("It is the intention of [the State of Georgia] that this article be construed consistently with Title XIX ....").

One requirement of the Medicaid Act is that Georgia provide, as a condition of eligibility to receive benefits under its Medicaid program, that individuals assign

to the State any rights to payment for medical care from third parties.  See 42

U.S.C. § 1396k(a).[3]  Georgia has implemented this federal command through

Section 49-4-149 of its state code, which provides that:

> A recipient of medical assistance who receives medical care for which the department may be obligated to pay shall be deemed to have made assignment to the department of any rights of such person to any payments for such medical care from a third party, up to the amount of medical assistance actually paid by the department ....  The assignment created by this subsection shall be effective until the recipient of medical assistance is no longer an eligible recipient for medical assistance.

O.C.G.A. § 49-4-149(d); see also id. § 49-4-148 (Georgia Department of

Community Health may seek reimbursement from third party who is legally liable

---

[3]  Section 1396k(a) states:

> (a) For the purpose of assisting in the collection of medical support payments for medical care owed to recipients of medical assistance under the State plan approved under this subchapter, a State plan for medical assistance shall –
>
> > (1)  provide that, as a condition of eligibility for medical assistance under the State plan to an individual who has the legal capacity to execute an assignment for himself, the individual is required –
> >
> > (A)  to assign the State any rights, of the individual or of any other person who is eligible for medical assistance under this subchapter and on whose behalf the individual has the legal authority to execute an assignment of such rights, to support (specified as support for the purpose of medical care by a court or administrative order) and to payment for medical care from a third party.

42 U.S.C. § 1396k(a).

to pay for recipient's medical assistance and may be subrogated "only to the extent of such reasonable value of the medical assistance paid").

The Medicaid Act regulates the distribution of proceeds collected by states from third parties under an assignment of rights "in a manner that parallels the usual subrogation rules." Floyd v. Thompson, 227 F.3d 1029, 1032 (7th Cir. 2000). The Act provides that:

> Such part of any amount collected by the State under an assignment made under the provisions of this section shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance), and the remainder of such amount collected shall be paid to such individual.

42 U.S.C. § 1396k(b). As this provision indicates, in the event that Georgia recovers monies from a third party under the Medicaid recipients' assignment of rights, the State must retain only that amount of money necessary to reimburse it for its actual medical assistance payments, must reimburse the federal government to the extent of its participation in financing those payments and, lastly, must pay "the remainder of such amount collected" to individual Medicaid recipients. See also 42 C.F.R. § 433.154 (the state must distribute collections to itself, to the federal government and, lastly, to individual recipients).

19

The plaintiffs contend that Georgia's portion of the settlement proceeds is subject to the disbursement requirements in § 1396k(b), because those proceeds are being collected by the State "under an assignment of rights." They maintain that the total amount Georgia is scheduled to receive under the settlement agreement, roughly $4.8 billion, exceeds the amount the State spent on medical assistance. Accordingly, the plaintiffs argue, § 1396k(b) of the Medicaid Act requires Georgia to distribute that excess money to them.

In deciding the merits of the plaintiffs' claims, we will assume as they contend, that Georgia's $4.8 billion recovery is being or will be collected "under an assignment" within the meaning of 42 U.S.C. § 1396k(b). Still, that provision states that Georgia shall retain "[s]uch part of any amount collected by the State under an assignment made under the provisions of this section ... necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed ...." Id. That clearly means plaintiffs have a valid claim, if at all, only to amounts Georgia has or will receive under the settlement agreement that exceed what the State spent providing medical assistance. See 42 U.S.C. § 1396k(b); see also 42 C.F.R. § 433.154.

The problem for the plaintiffs is that Georgia cannot collect "under an assignment" anything beyond what it actually spent on medical assistance, because

under the state's Medicaid law the only thing the plaintiffs assigned to Georgia were their rights to collect payments "up to the amount of medical assistance actually paid by the [State]." See O.C.G.A. § 49-4-149(d) ("A [Medicaid] recipient ... shall be deemed to have made assignment to the [State] of any rights of such person to any payments for such medical care from a third party, up to the amount of medical assistance actually paid by the [State] ...."); see also 42 C.F.R. § 433.146(c). The plaintiffs assigned to Georgia their rights to collect only the amount the State had spent on medical treatment, which under § 1396k(b) is the State's own share of the settlement proceeds. We agree with the Seventh Circuit that because "there is nothing in the [settlement agreement] to which the plaintiffs may assert a claim," Floyd, 227 F.3d at 1037, they have failed to state a claim upon which relief may be granted. Accord Skillings v. Illinois, 121 F. Supp.2d 1235, 1237-38 (C.D. Ill. 2000); Clark v. Stovall, No. 00-4054 (D. Kan. March 2, 2001); see also Strawser v. Lawton, 126 F. Supp. 2d 994, 1001 (S.D. W.Va. 2001) (dicta); Cal. v. Superior Court, 99 Cal. Rptr. 2d 735, 742 n.10 (Cal. Ct. App. 2000).

Our conclusion is reinforced by the terms of the settlement agreement, which defines "Releasing Parties" as the various settling states, their subdivisions, and representatives, but which explicitly excludes from the release persons seeking "solely ... private or individual relief for separate and distinct injuries." By that

21

means, the agreement preserves the plaintiffs' right to sue the tobacco companies for their tobacco-related injuries and illnesses. See Floyd, 227 F.3d at 1037 ("[The settlement agreement] did not purport to extinguish the claims of individual persons who were not part of the settlement process..."); Strawser, 126 F. Supp. 2d at 1001-02. The reason the agreement preserved all claims of these plaintiffs and those like them is that the settlement proceeds were paid only for other claims – those covering the interests of the settling states themselves. The plaintiffs are not entitled to any of the settlement proceeds now or in the future.

## IV. CONCLUSION

We AFFIRM the dismissal of the complaint on Eleventh Amendment grounds as to the Georgia Department of Public Health. Whether the complaint should have been dismissed on Eleventh Amendment grounds insofar as the state official defendants are concerned is an issue we need not address, because the complaint clearly fails to state a claim upon which relief can be granted. We VACATE the district court's dismissal on Eleventh Amendment grounds as to the state official defendants and REMAND with instructions that the complaint be dismissed under Fed. R. Civ. P. 12(b)(6).

NOONAN, Circuit Judge, concurring in the judgment:

This action is barred by 42 U.S.C. § 1396b(d)(3)(B)(ii).