MARTIN, Circuit Judge,
concurring in part and dissenting in part:
I agree with my colleagues that, based on WellPoint’s actions after the Effective Date of the Settlement Agreement in the earlier class action regarding WellPoint’s reimbursement of claims, the District Court abused its discretion in concluding that certain ERISA claims in the later-filed cases were Released Claims.[1] But based on the language of that Settlement Agreement, I would reach this same result for the RICO and antitrust claims the Physicians seek to bring here as well. Like the ERISA claims, the RICO and antitrust claims also depend on WellPoint’s actions taken after the Effective Date. Therefore, the ruling I seek — that the ERISA, RICO, and antitrust claims based on WellPoint’s actions taken after the Effective Date of the Settlement Agreement were not released by that Agreement— would treat all of these claims the same. In contrast, the Majority’s Opinion reaches different results for various claims made based on identical post-Effective Date actions taken by WellPoint and vacates the injunction only as to certain ERISA claims. I would lift the Injunction as to the RICO and antitrust claims as well, so I *1241 dissent from the Majority Opinion in that respect.
I. BACKGROUND
In 2005, WellPoint agreed to change a number of its business practices in order to settle MDL 1334. Among the changes WellPoint agreed to was to change the way it had determined usual, customary, and reasonable rates. Specifically, the Settlement Agreement stated that WellPoint “agrees that, to the extent it uses Physician charge data to determine the usual, reasonable and customary amount to be paid for services performed by Non-Participating Physicians, it will not use any internal claims database that” systematically underprices the claims.
For their part, the Physicians agreed that as of the Effective Date of the agreement they were giving up certain claims. The Settlement Agreement defined the Released Claims as:
any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys’ fees, losses, claims, liabilities and demands of whatever kind or character (each a “Claim”), arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, cir-. cumstanees or other matters referenced in the Actions, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons, or to the business practices that are the subject of § 7.
Settlement Agreement § 13.1(a). As the Majority recognizes, “the inclusion of an Effective Date into the Settlement Agreement clearly contrasts the idea of barring all claims against WellPoint in perpetuity.” Maj. Op. at 1238.
After preliminary approval of the settlement by the District Court, a notice of the settlement was mailed to potential class members. The notice began: “IF YOU ARE A PHYSICIAN WHO PROVIDED COVERED SERVICES TO ANY INDIVIDUAL ENROLLED IN OR COVERED BY CERTAIN HEALTH CARE PLANS AT ANY TIME BETWEEN AUGUST 4, 1990 AND JULY 15, 2005 ... PLEASE READ THIS NOTICE CAREFULLY.” The part of the notice that told the class members about the claims which would be released against WellPoint described them as those “arising on or before the date that the Court’s order approving the settlement becomes final, that are, were or could have been asserted.” The next sentence added that “claims that exist now or that might arise in the future” are waived against BCBSA. The notice highlighted that at an upcoming hearing, the District Court “will consider whether to enter orders that would prevent members of the Class and certain other persons, including the Defendants in the Actions other than WellPoint, from asserting certain claims against WellPoint in the future.”
The District Court approved the Settlement Agreement for MDL 1344 in an Amended Order filed in January 2006. That Order permanently enjoined the Physicians who had not opted out of the Settlement Agreement from participating in lawsuits “arising out of or relating in any way to the Released Claims.” Generally tracking the language in the class notice, the amended order approving the settlement noted that claims “that exist now or that might arise in the future against BCBSA” were released, while against WellPoint claims were released “that are, were or could have been asserted against *1242 any of the Released Parties by reason of, arising out of, or in any way related to” the facts at issue. The District Court retained jurisdiction on “all matters relating to (a) the interpretation, administration, and consummation of the Settlement Agreement and (b) the enforcement of the injunctions described.”
Then in 2009 came the UCR MDL lawsuit alleging antitrust, RICO, ERISA, and state law violations by WellPoint and others in connection with a conspiracy of failing to pay the UCR rates for out-of-network services. The Second Consolidated Amended Complaint in the UCR MDL alleged that “Ingenix serves as a conduit for the conspiracy and is a hidden profit engine of the health insurance business.” That Complaint includes allegations, for example, that after the Effective Date of the Settlement Agreement for the MDL 1344 case, WellPoint provided false and misleading certifications to Ingenix, and that Ingenix, knowing that certain answers from WellPoint were false, “continued to accept the data and overlook the falsehoods, nevertheless.” Fundamentally, the question presented by this appeal is whether the claims raised by these plaintiffs in the UCR MDL are barred because they are Released Claims under the MDL 1334 Settlement Agreement.
II. DISCUSSION
There are two related ways to analyze whether the claims advanced in this lawsuit were released in the earlier one. The first is to examine the language used in the Settlement Agreement and class notice. The second is to apply this Court’s precedent to the facts of this case. Both analy-ses lead to the conclusion that the UCR MDL claims were not released.
A. TEXT OF THE SETTLEMENT AGREEMENT AND CLASS NOTICE
I begin with the language of the Settlement Agreement, particularly the definition of Released Claims. It is not in dispute that if parties to a settlement clearly and unambiguously agree to do so, “[f]u-ture damages may be released if such is the intent of the parties.” W.J. Perryman & Co. v. Penn. Mut. Fire Ins. Co., 324 F.2d 791, 793 (5th Cir.1963).[2] However, the language of a settlement agreement determines whether that is so. “Litigation or settlement will not automatically bar a later suit for a second, identical breach.” Klein v. John Hancock Mut. Life Ins. Co., 683 F.2d 358, 360 (11th Cir.1982). There are two ways in which the definition of Released Claims here indicates the intent to limit the release and not include future damages. They are the definition’s time limit of “arising on or before the Effective Date,” and the statement that the claims released “are, were or could have been asserted.”
Because the term “arising” is not defined in the Settlement Agreement, it is necessary to look to the common understanding of the term. For a long time, courts have understood that an action does not arise until a plaintiff has a legal right to sue on it. See, e.g., St. Louis & S.F.R. Co. v. Spiller, 274 U.S. 304, 313, 47 S.Ct. 635, 638, 71 L.Ed. 1060 (1927) (finding “that the term ‘arise’ was used in the decree as the equivalent of ‘accrue’ ”); Fed. Reserve Bank v. Atlanta Trust Co., 91 F.2d 283, 287 (5th Cir.1937) (“This cause of action did not, it could not, arise until plaintiff had paid the moneys out, and was in a position to demand reimbursement.”); see also Levy v. Ohl, 477 F.3d *1243 988, 992 (8th Cir.2007) (stating that “plaintiffs right to sue arises ... when the plaintiff could first maintain his cause of action successfully” (quotation omitted)).
Based on this understanding of the word arising, and because the Settlement Agreement defined Released Claims as those “arising on or before the Effective Date,” the Physicians released only those claims they could have sued for as of the Effective Date. In contrast, the only claims asserted in the UCR MDL were those that required additional acts to take place after the Effective Date. Critically, the Physicians allege that WellPoint committed new acts after the Effective Date, which caused them to be underpaid for certain services.
The import of the definition of Released Claims in the Settlement Agreement is buttressed by its use of the phrase “are, were or could have been asserted.” “Are” asserted claims were those asserted at the time of the Settlement Agreement — clearly the claims in the UCR MDL are not among those. “Were” asserted claims would be those that had already been asserted. Again, the UCR MDL claims had not. The question remaining, then, is whether the UCR MDL claims “could have been” brought at the time the parties entered into the Settlement Agreement. Following this analysis, the Majority acknowledges and recognizes that certain claims in the UCR MDL could not have been brought but for the new actions Well-Point took after the Effective Date. Maj. Op. 1237-38. I agree. However, the Majority does not extend the logic behind its recognition that the ERISA claims could not have been brought prior to the Effective Date of the Settlement of the MDL 1344 case to the remainder of claims brought by the Physicians in the UCR MDL. To the contrary, the Majority finds that the remaining claims were released by the Settlement Agreement.
WellPoint argues that the Physicians “do not suggest ... WellPoint began doing something different or new that it had not been doing before.” But this argument ignores that WellPoint agreed to quit doing what it had done before. The Physicians entered into the Settlement Agreement, which called for payments by WellPoint and WellPoint’s agreement to change the way it made reimbursements so as to avoid future problems. Nothing in the Settlement Agreement suggests that the Physicians gave up their right to take action in the future if WellPoint engaged in new, wrongful conduct that resulted in underpayment for services not yet rendered. So while the Physicians never dispute that WellPoint had underpaid them in the past, they do allege new acts resulting in fresh underpayments. Cf. Manning v. City of Auburn, 953 F.2d 1355, 1360 (11th Cir.1992) (“[W]e do not believe that the res judicata preclusion of claims that ‘could have been brought’ in earlier litigation includes claims which arise after the original pleading is filed in the earlier litigation.”).
This plain reading of the Settlement Agreement is in keeping with the notice to potential class members. Certainly it is the language of the Settlement Agreement that controls, but the notice underscores that the UCR MDL claims were not released in the MDL 1334. First, the notice, in all capital letters, tells physicians who provided services “between August 4, 1990 and July 15, 2005” to read the notice carefully. As a result, physicians providing services after July 15, 2005 are not given any notice that they are impacted by the settlement. It is only those doctors who provided services between the delineated dates that were clearly informed of the release. Physicians who had not yet provided the relevant services, but might do so in the future, would understandably believe this notice had no relevance to them.
*1244 Second, the notice states that class members are giving up “all claims that exist now or that might arise in the future” against BCBSA. But the language the parties chose to describe the claims that were released against WellPoint is strikingly different. For WellPoint, the notice says that class members are giving up claims arising on or before the Effective Date. It is true that the details of the settlement, including the treatment of possible future claims, was to be the subject of a hearing before the District Court. Again however, the notice gave no indication that the Settlement Agreement was intended to release future claims against WellPoint by class members for services not yet rendered.
WellPoint argues that if the Settlement Agreement is interpreted to allow for future claims, “companies would not be able to settle class action lawsuits because they could never be assured of ‘buying peace’ no matter how much they paid.” Quite to the contrary, the Settlement Agreement did buy peace for WellPoint for all of its conduct prior to the Effective Date. It just did not protect WellPoint for any misconduct for all time. WellPoint remains “on the hook” for any new bad acts it commits after the Effective Date. And it is only new actions, taking place after the Settlement Agreement, which are at issue in the UCR MDL. See Lawlor v. Nati Screen Serv. Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955) (“Acceptance of the respondents’ novel contention would in effect confer on them a partial immunity from civil liability for future violations.”).
WellPoint argues that another section of the Settlement Agreement, titled “Covenant Not to Sue,” supports their interpretation. Section 13.2(a) states that the releasing parties will not participate in litigation “based upon or related to any Released Claim.” While the use of “related to” in § 13.2(a) suggests a broader covenant not to sue than what is in the definition of Released Claims, when read alongside the other Settlement Agreement provisions it is clear the parties intended a cutoff point. WellPoint argues, in effect, that any underpayment must be related to this settlement, simply by virtue of being an underpayment. But the setting of an Effective Date within the Settlement Agreement conflicts with the idea of barring all claims against Well-Point in perpetuity. New actions taken by WellPoint after the Effective Date of the Settlement Agreement, and resulting in underpayments, are not covered by the Covenant Not To Sue. Those claims— ERISA or otherwise — are therefore not released.
Counsel for WellPoint seemed to acknowledge this point at oral argument. He said that if WellPoint began doing something new after the Effective Date, it would be actionable under the Settlement Agreement:
So let’s say we stopped using Ingenix in 2008 and we began using a brand new database that we hadn’t used before. Then I think the Plaintiffs could come along and say, “Well, look, we’re complaining about something new that you weren’t doing before.”[3]
But this is a distinction without a meaningful difference. The Settlement Agreement does not mention Ingenix. The gravamen of the Physicians’ concern was with being underpaid — by whatever mechanism. The Settlement Agreement was intended to compensate the Physicians for underpayments in the past and change WellPoint’s business practices to avoid underpayments in the future. And the Majority acknowledges that WellPoint engaged in “new, overt acts.” Maj. Op. at 1236. However, the Majority characterizes those acts as *1245 being a part of “an ongoing conspiracy.” The plain language of the Settlement Agreement provides that claims predicated upon future acts taken by WellPoint to underpay physicians are not released.
B. APPLICATION OF CASE LAW TO FACTS
A familiar canon of construction helps clarify that the claims here were not released. The word “future” does not appear in the definition of Released Claims in § 13.1(a) of the Settlement Agreement. And the parties were certainly aware of their ability to negotiate away future claims. That is evidenced by the fact that the parties referred to future claims in § 13.1(b), where the Settlement Agreement discusses claims against BCBSA. To my mind, this distinction demonstrates the parties’ choice not to address future claims as to WellPoint. See In re Celotex Corp., 487 F.3d 1320, 1334 (11th Cir.2007) (“[W]hen certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.” (quotation omitted)); see also Maj. Op. at 1239 (“If the parties had intended the scope of § 13.1(a) to mirror that of 13.1(b), which expressly releases claims that could arise after the Effective Date — although based on conduct that existed prior to the effective date — the parties would have used such language in § 13.1(a).”)
WellPoint argues that “federal class action settlements routinely include releases waiving future claims.” This is certainly true. However, the cases WellPoint points to in support of this proposition are readily distinguishable, at least because the Settlement Agreement it relies upon does not refer to future claims against WellPoint. For example, WellPoint cites to McClendon v. Georgia Department of Community Health, 261 F.3d 1252 (11th Cir.2001). The McClendon litigation arose out of a tobacco settlement agreement negotiated by 46 states and a number of tobacco companies. The McClendon plaintiffs were Medicaid recipients who wanted proceeds of the settlement beyond what Georgia paid on medical assistance, but they had not participated in the negotiations of that settlement agreement. The defendants moved to dismiss. In addition to being factually inapposite and arising in a very different procedural posture, then, the language of the release in McClendon refers explicitly to “future conduct” and “future Claims.” Id. at 1254. Considering that language, this Court observed that “[a]s the quoted provisions indicate, by entering into the settlement agreement Georgia released its past and future claims.” Id. at 1255. The McClendon release clearly reflected the intent of the parties as to future claims, while the agreement before us does not. For many reasons, McClendon’s guidance for this case is limited.
WellPoint also points to cases addressing antitrust violations based on conduct that originated at a prior time, arguing that courts “have found that releases do bar antitrust claims when they are based on a continuation of the released conduct.” Again — this is certainly true. However, the utility of the cases relied upon by WellPoint to help it here is belied by the facts of those decisions. For example, WellPoint claims the case Madison Square Garden, L.P. v. National Hockey League, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008), is similar to this case. Instead it is quite different. Madison Square Garden had signed an agreement that “forever releases and discharges” the National Hockey League from any claims related to policies in effect at the time the agreement was executed in 2005. Id. at *5. Notwithstanding this language, Madison Square Garden sued based on “no allegations of posh-2005 conduct apart from (1) the enforcement of pre-existing policies and (2) the 2006 ex *1246 tension of the licensing agreement that had been in place since 1994, which reaffirmed each Member Club’s assignment of the right to ‘use or license its team’s trademarks’ to the League.” Id. at *6. Given the gap between what claims Madison Square Garden released and what claims they subsequently brought, the District Court “ha[d] little trouble” dismissing certain claims. Id. at *7. Quite distinctive from Madison Square Garden, this case involves new post-release conduct. Thus, the holding in Madison Square Garden is of little assistance here.
WellPoint also relies on Klay v. All Defendants, 309 Fed.Appx. 294 (11th Cir.2009). In Klay, the plaintiffs were “forced to concede that their claims predate the Effective Date of the settlement.” Id. at 295 (quoting MDL 1334 Dkt. 5838 (MDL 1334 R & R) at 18). Indeed, a review of the Report & Recommendation in that case makes the distinction between Klay and this case even more clear. In Klay, “Plaintiffs suggest that it is irrelevant whether their claims existed prior to the settlement, so long as they were subjectively unaware of the existence of their claims.” (MDL 1334 R & R at 18 (emphasis added)). There is no such concession or suggestion here. Thus, Klay is of little relevance to this case. The same is true of Thomas v. Blue Cross & Blue Shield Ass’n, 594 F.3d 814 (11th Cir.2010), another case relied upon by WellPoint and cited by the Majority. See id. at 822 (“Kol-busz’s claims of tortious interference and defamation arise from acts that occurred before the effective date, which is the only date the district court should have considered.”).
WellPoint is correct that this Court and others have encouraged the pretrial settlement of class action lawsuits. See, e.g., In re U.S. Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir.1992). But I am not aware that this Court has ever encouraged protection for future wrongdoing, particularly where parties have not expressly addressed it in their settlement agreement. The Settlement Agreement here did not immunize WellPoint for future underpayments to doctors. For these reasons, I would vacate the Injunction not just for the ERISA claims, but for the RICO and antitrust claims as well.

. I will use the terms the Majority did, including UCR MDL (referring to the lawsuit filed in 2009 challenging the post-Settlement Agreement's usual, customary, and reasonable rates of reimbursement, which is the subject of this appeal), MDL 1334 (referring to the case number of the earlier litigation originally filed in 2000, assigned as a Multi-District Litigation case to the District Court in the Southern District of Florida, and settled in 2005), and BCBSA (Blue Cross Blue Shield of America). Also, when I use the term Physicians, I refer collectively to the doctors and their professional associations that are the Appellants in this case.

. In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. id. at 1209.

. Oral Argument at 27:52-28:11, Oct. 9, 2013.