Cirilo B. CARDENAS, Sr.; Alejandro M. Asprer; Margaret D. Palting; Lex A. Bautista, on Behalf of Themselves and Others Similarly Situated, Plaintiffs–Appellants,

v.

Earl I. ANZAI, Attorney General, State of Hawai'i, in his Official Capacity; Neal Miyahara, Director, Department of Budget and Finance, State of Hawai'i, in His Official Capacity; Susan M. Chandler, Ph.D., Director, Department of Human Services, State of Hawai'i, in Her Official Capacity, Defendants–Appellees,

and

Citibank, N.A., Defendant.

No. 01–15297.

United States Court of Appeals, Ninth Circuit.

Argued Nov. 6, 2001.

Submitted June 24, 2002.

Filed Nov. 18, 2002.

930

Antonio Ponvert, III, Bridgeport, Connecticut, for the plaintiffs-appellants.

Charles Fell, Deputy Attorney General, Honolulu, Hawai'i, for the defendants-appellees.

Before THOMPSON, O'SCANNLAIN and BERZON, Circuit Judges.

Opinion by Judge THOMPSON; Concurrence by Judge O'SCANNLAIN.

## OPINION

DAVID R. THOMPSON, Circuit Judge.

This case arises from the comprehensive settlement agreement reached in 1998 among major American tobacco companies and 46 states, including Hawai'i, that sued them for reimbursement of Medicaid and other costs attributable to smoking. Pursuant to the settlement agreement, Hawai'i will receive approximately $1.38 billion over the next 25 years. The plaintiffs are Medicaid recipients [1] who suffer from smoking-related illnesses. The plaintiffs assert that to the extent the settlement funds to be received by the State of Hawai'i exceed the State's actual expendi-

---

1. Although the plaintiffs brought suit on behalf of themselves and others similarly situat- ed, the court dismissed the plaintiffs' suit before it was certified as a class action.

tures for tobacco-related illnesses on behalf of Medicaid recipients (hereafter the "overage"), the State of Hawai'i is required by 42 U.S.C. § 1396k(b) to distribute that "overage" to Medicaid recipients. Although the plaintiffs sued Hawai'i state officials in their official capacities, not the State of Hawai'i directly, the district court dismissed the lawsuit, determining it was barred by sovereign immunity under the Eleventh Amendment.

We conclude, pursuant to the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that the suit is not barred by sovereign immunity. We further conclude, however, that the claims the plaintiffs allege are precluded by Congress's 1999 amendment to the Medicaid statute, which provides that tobacco settlement funds received by a state may be used "for any expenditures deemed appropriate by the State." *See* 42 U.S.C. § 1396b(d)(3)(B)(ii). Thus, we affirm the district court's dismissal on that basis.

## I.

On January 31, 1997, Hawai'i sued the major domestic tobacco companies, seeking damages for costs related to tobacco-related injuries suffered by its Medicaid recipients. Hawai'i's lawsuit was based upon a variety of theories including false advertising, fraudulent and negligent misrepresentation, civil conspiracy, negligence, products liability, and restitution for health care costs for recipients of public assistance. On November 23, 1998, Hawai'i, along with 45 other states that had filed similar actions against the tobacco companies, entered into a "global" settlement. Under the Master Settlement Agreement ("MSA"), which memorialized the "global" settlement, the tobacco companies agreed to take steps aimed at reducing or eliminating tobacco use by minors and educating the public at large

about the dangers of tobacco use. MSA, at 18–47, *available at* http://www.library.ucsf.edu/ tobacco/litigation (Nov. 1998). The tobacco companies also agreed to pay various sums to the settling states over 25 years, in amounts to be calculated based upon a complex formula. *Id.* at 112–114. It is estimated that at the end of the 25–year payout, the State of Hawai'i will have received as much as $1.38 billion.

Hawai'i has established the Hawai'i Tobacco Settlement Special Fund, into which its share of the tobacco settlement proceeds will be deposited. Under related state legislation, effective July 1, 2002, the settlement funds received by Hawai'i will be allocated as follows: (1) twenty-four and one-half percent to the emergency and budget reserve fund; (2) thirty-five percent to the Department of Health for funding the children's health insurance program and the department's health promotion and disease prevention programs; (3) twelve and one-half percent to the Hawai'i Tobacco Prevention and Control Trust Fund; and (4) twenty-eight percent to the university revenue-undertakings fund for the payment, as may be necessary, of principal and interest on revenue bonds issued to finance construction of a health and wellness center, including a new medical school facility, at the University of Hawai'i on the Island of Oahu. Haw.Rev.Stat. § 328L–2 (2001).

The plaintiffs are Hawai'i Medicaid recipients who suffer from tobacco-related illnesses. They filed this lawsuit against officials of the State of Hawai'i, alleging that the officials violated, and continue to violate, the federal disbursement rules for Medicaid recovery set forth in 42 U.S.C. § 1396k(b). Specifically, the plaintiffs assert that a portion of M.S.A. funds received by the State of Hawai'i constitute amounts previously assigned to the State by them and other recipients of public

assistance upon receipt of medical benefits for their tobacco-related illnesses. They allege that the state officials are thus required to: (1) determine what portion of the M.S.A. funds are attributable to their Medicaid assigned ·claims; (2) ascertain how much money the State has spent for treatment of tobacco-related illnesses on behalf of recipients of public assistance; and (3) distribute the "overage", if. any, to eligible Medicaid recipients. The plaintiffs seek declaratory and injunctive relief requiring the state officials to comply with the federal Medicaid distribution rules set forth in 42 U.S.C. § 1396k(b).

The defendants moved to dismiss the complaint solely on the ground of sovereign immunity under the Eleventh Amendment. The district court granted that motion, and did not consider the merits of the plaintiffs' claims. This appeal followed.

## II.

The defendants argue that the district court lacked subject matter jurisdiction because the plaintiffs lack standing and their claims are not ripe for adjudication. Because standing and ripeness are threshold requirements, without which neither the district court nor this court has jurisdiction, we address these issues first. *See Pritikin v. Dep't of Energy,* 254 F.3d 791, 796 (9th Cir.2001).

■ "[T]o satisfy Article III's standing requirements, a plaintiff must show (1)[he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. De-*

*fenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 · L.Ed.2d 351 (1992)). The defendants contend that the plaintiffs' injuries are not concrete and particularized because the 1999 amendment to the Medicaid statute, codified at 42 U.S.C. § 1396b(d)(3)(B)(ii), removed any stake the plaintiffs might have had in the settlement funds. Additionally, the defendants argue that because the settlement funds resulting from the M.S.A. will be paid out over 25 years, the plaintiffs' asserted injuries are too speculative.

■■ "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. . . ." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. In˙ this case, the plaintiffs allege that, pursuant to the MSA, Hawai'i will receive the settlement proceeds through annual payments over the next 25 years and that the state officials will cause all of those proceeds to be used for the state's own purposes, depriving its Medicaid recipients of any "overage" which is payable to them under 42 U.S.C. § 1396k(b). These allegations are sufficient to allege both that a concrete injury actually occurred, and that a future injury will likely occur. *See Nelsen v. King County,* 895 F.2d 1248, 1250–51 (9th Cir.1990) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), and *O'Shea v. Littleton,* 414 U.S. 488, 491, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Whether the 1999 amendment to the Medicaid statutes frees Hawai'i to do with the proceeds as it sees fit is a question of law that does not affect the plaintiffs' standing to bring this suit. *See Davis v. Passman,* 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 60· L.Ed.2d 846 (1979) (noting that question of whether a plaintiff has standing to bring suit, and thus whether the court has jurisdiction to hear the controversy, is separate from the

question of whether a plaintiff has a cause of action). The plaintiffs have standing.

■ We also conclude that the plaintiffs' claims are ripe for adjudication. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted). *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (quoting 13A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3532, at 112 (1984))). The defendants contend that the plaintiffs' claims are not ripe for adjudication because too many speculative contingencies must be fulfilled before the plaintiffs can successfully challenge the allocation of the M.S.A. funds. For example, the defendants argue that, until the end of the 25-year period, it cannot be determined whether any portion of the funds received by the State of Hawai'i will constitute an "overage" allegedly distributable to Medicaid recipients.

■ Despite the contingencies noted by the defendants, the State of Hawai'i has created a dedicated fund for settlement proceeds, and has allocated its first payment under the M.S.A. to that fund. Because Hawai'i has taken this course of action, the question regarding the state's proper usage of the settlement funds is no longer an "abstract disagreement[ ] over administrative policies," *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Taking the plaintiffs' allegations as true, the effect of the state's decision to allocate the money has already been "felt in a concrete way by the challenging parties." *Id.* at 148–49, 87 S.Ct. 1507. The plaintiffs' claims are ripe for adjudication.

### III.

■ We next consider the parties' sovereign immunity arguments.[2] Although the plaintiffs sued Hawai'i state officials, not the State of Hawai'i, the district court concluded that the plaintiffs' complaint was nonetheless barred by sovereign immunity under the Eleventh Amendment. We review de novo a district court's determination that a suit against a state official is barred by the state's Eleventh Amendment immunity. *Romano v. Bible*, 169 F.3d 1182, 1185 (9th Cir.1999).

■ A state's sovereign immunity from suit in federal court normally extends to suits against its officers in their official capacities. *See, e.g., Natural Res. Def. Council v. Cal. Dep't of Transp.*, 96 F.3d 420, 421–22 (9th Cir.1996). The Supreme Court set forth an exception, however, in *Ex parte Young*. Under the *Ex parte Young* doctrine, a plaintiff may maintain a

---

2. We are aware that several circuits have bypassed the Eleventh Amendment question in these tobacco settlement cases, in favor of the perhaps more easily resolvable question of whether the plaintiffs can succeed on the merits. *See Greenless v. Almond*, 277 F.3d 601, 607–08 (1st Cir.2002); *Strawser v. Atkins*, 290 F.3d 720, 730 (4th Cir.2002); *Tyler v. Douglas*, 280 F.3d 116, 121 (2d Cir.2001) *cert. denied* —— U.S. ——, 122 S.Ct. 2361, 153 L.Ed.2d 182 (2002); *McClendon v. Georgia Dep't of Comm. Health*, 261 F.3d 1252, 1259 (11th Cir.2001); *Floyd v. Thompson*, 227 F.3d 1029, 1035 (7th Cir.2000). We have concluded, however, that we may not bypass the issue in favor of deciding the case on the merits. *See Cal. Franchise Tax Bd. v. Jackson (In re Jackson)*, 184 F.3d 1046, 1048 (9th Cir.1999) (issue of sovereign immunity raised by the court sua sponte; court stated the issue must be resolved before reaching the merits). Thus, we will confront the parties' Eleventh Amendment arguments as a threshold issue.

suit for *prospective relief* against a state official in his official capacity, when that suit seeks to correct an ongoing violation of the Constitution or federal law. *Ex Parte Young,* 209 U.S. at 159–60, 28 S.Ct. 441; *see also Armstrong v. Wilson,* 124 F.3d 1019, 1026 (9th Cir.1997) (rejecting the argument that *Ex parte Young* applies only to constitutional, not statutory, violations). The *Ex parte Young* doctrine is founded on the legal fiction that acting in violation of the Constitution or federal law brings a state officer "into conflict with the superior authority of [the] Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Young,* 209 U.S. at 159–60, 28 S.Ct. 441.

Whether the *Ex parte Young* doctrine applies in this case turns primarily upon one question: Is the relief the plaintiffs seek prospective, aimed at remedying an ongoing violation of federal law, or is it retrospective, aimed at remedying a past violation of the law? [3] The district court concluded that the relief the plaintiffs seek, although couched in terms of declaratory and injunctive relief, actually requests retrospective monetary damages. Relying on two district court decisions, the district court reasoned that because the state became entitled to the funds at the time the M.S.A. was signed, the entry of an injunction or declaratory judgment requiring state officials in the future to distribute to the plaintiffs the "overage" described in § 1396k(b) would be equivalent to an order telling the State how to disburse funds from its treasury. The district court, therefore, determined that the plaintiffs' claims were for money damages

against the state and ran afoul of the Eleventh Amendment. We disagree.

The Supreme Court explicated the distinction between permissible prospective, and impermissible retrospective, relief for purposes of the *Ex parte Young* doctrine in a series of cases in the 1970s. In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court held that an injunction requiring a state official to conform his administration of a federal welfare program to federal law was prospective and thus not barred by the Eleventh Amendment, but that an order that the official remit the amounts he had wrongfully withheld in the past was retrospective and thus impermissible. *See id.* at 664–65, 94 S.Ct. 1347. The Court acknowledged that the distinction between prospective and retrospective relief would "not in many instances be that between day and night," *id.* at 667, 94 S.Ct. 1347; it stated firmly, however, that where a decree grants relief "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials," it "is in practical effect indistinguishable in many aspects from an award of damages against the State" and is barred by the state's sovereign immunity, *id.* at 668, 94 S.Ct. 1347.

The Court narrowed the scope of *Edelman's* broadly phrased prohibition in two later cases. In *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the Court clarified that a prospectively oriented injunction could have a "direct and substantial impact" on a state's treasury without running afoul of the rule in *Edelman,* so long as the expenditure of funds was ancillary to the injunction's pri-

---

**3.** The defendants also argue that the plaintiffs' action lacks merit and for that additional reason it is barred under *Ex parte Young.* The Supreme Court has recently clarified, however, that the *Ex parte Young* inquiry does not

include an analysis of the merits of the claim. *Verizon Maryland, Inc. v. Public Serv. Comm'n,* 535 U.S. 635, 122 S.Ct. 1753, 1761, 152 L.Ed.2d 871 (2002).

mary objective (which, in *Milliken*, was remedying the unconstitutional segregation of the Detroit public schools). *Id.* at 289, 97 S.Ct. 2749; *see also id.* at 290 n. 22, 97 S.Ct. 2749 ("In contrast to *Edelman*, there was no money award here in favor of respondent Bradley or any members of his class."). In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), a continuation of the *Edelman* litigation, the Court clarified that an injunction requiring the state to provide notice to the plaintiff class about the availability of state administrative remedies for the past deprivation of benefits was permissible, because it was "more properly viewed as ancillary to the prospective relief already ordered by the court." *Id.* at 349, 99 S.Ct. 1139; *see also id.* at 347–48, 99 S.Ct. 1139 (rejecting the state official's argument that "giving the proposed notice [would] lead inexorably to the payment of state funds for retroactive benefits," because the causal links were indirect at best and not directly imposed by the federal injunction).

The Supreme Court again addressed the distinction between permissible prospective, and improper retrospective, relief in *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). There, the Court stressed that "*Young's* applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." (internal quotation marks omitted). *Id.* at 277, 106 S.Ct. 2932 (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting *Young*, 209 U.S. at 160, 28 S.Ct. 441)). The Court explained that the inquiry must focus on the purpose of the relief sought:

Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant.... On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

*Papasan*, 478 U.S. at 278, 106 S.Ct. 2932. Applying this analysis, the Court in *Papasan* held that the plaintiffs' breach of trust claim was barred by the Eleventh Amendment because even though the requested remedy was couched in terms of declaratory relief, that remedy sought to correct a past legal wrong and would require the repayment of an accrued monetary liability. *Id.* at 280–81, 106 S.Ct. 2932. On the other hand, the plaintiffs' equal protection claim, alleging that there was a present disparity in the distribution of benefits of the State's school lands, was not barred by the Eleventh Amendment. *Id.* at 282, 106 S.Ct. 2932. The Court explained that although the current disparity in benefits might have resulted directly from the state's past illegal actions relative to the trust, "the essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and not the past actions of the State." *Id.* at 282, 106 S.Ct. 2932. The plaintiffs sought prospective relief to remedy that disparity, and the Court held the equal protection cause of action which sought to achieve that result was permissible under the Eleventh Amendment even though it might require the expenditure of state funds. *Id.*[4]

4. Similarly, in *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1986), the Court emphasized that it is the purpose of the relief rather than its form which is relevant.

■ Turning to the circumstances of the present case, two of our sister circuits have analyzed the question whether the relief sought by tobacco settlement plaintiffs is barred by the Eleventh Amendment; they have come to conflicting conclusions. In *Harris v. Owens*, 264 F.3d 1282 (10th Cir.2001), the Tenth Circuit stated that "[a]lthough the Eleventh Amendment bars compensatory relief for past injuries, 'relief that serves directly to bring about an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.'" *Id.* at 1291 (quoting *Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). The court in *Harris* concluded that the Eleventh Amendment would bar recovery *only* of those funds already paid to the state, but that "[w]ith respect to funds that have not been received, the officials have not yet violated federal law .... The relief [sought was] therefore prospective in character ...." *Id.* at 1292. The court held that the *Ex parte Young* doctrine applied, and the plaintiffs' claims for injunctive and declaratory relief were not barred by the Eleventh Amendment. *Id.*

By contrast, the Sixth Circuit in *Barton v. Summers*, 293 F.3d 944 (6th Cir.2002), like the district court in the present case, determined that although the state was to receive its portion of the settlement funds in installments over 25 years, the state had a present financial interest in the money. *Id.* at 949–50. Because it did, the court held that an injunction or declaratory judgment dictating how that money had to be distributed would violate the state's sovereign immunity under the Eleventh Amendment. *Id.* We believe this analysis misses the mark.

Although the State of Hawai'i has a present financial interest in the M.S.A. settlement funds, the plaintiffs seek to remedy what they allege to be a present and ongoing violation of federal law; they do not seek to establish past liability on the part of the State. The plaintiffs assert that the state officials are violating 42 U.S.C. § 1396k(b) on an ongoing basis, by accepting settlement funds annually and thereafter failing to remit any "overage" to the appropriate parties. They argue that the text of § 1396k(b) imposes the following obligation of allocation and distribution on the State of Hawai'i:

Such part of any amount collected by the State under an assignment made under the provisions of this section shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance), and the remainder of such amount collected [the "overage"] shall be paid to such individual.

42 U.S.C. § 1396k(b). Under this section, the state is not obligated to allocate the settlement funds until such time as the funds are received, and it is not required to distribute any "overage" to Medicaid recipients until after it has determined the amount attributable to reimbursement of Medicaid expenditures by the state and

Therefore, although declaratory relief is appropriate when ancillary to prospective relief, *Quern*, 440 U.S. at 349, 99 S.Ct. 1139, when there is no ongoing violation, "[t]he issuance of a declaratory judgment ... would have much the same effect as a full-fledged award of damages or restitution" and is barred. *Mansour*, 474 U.S. at 73, 106 S.Ct. 423. "[A] declaratory judgment is not available when the result would be a partial 'end run' around ... *Edelman v. Jordan* ...." *Id.*

federal governments. *Id.* As such, the state's responsibility to distribute any "overage" to Medicaid recipients did not accrue at the time the state entered the MSA, but rather will accrue in the future as the state receives settlement funds and determines what portion of such funds represents an "overage." *See Harris,* 264 F.3d at 1291.

We emphasize that the plaintiffs do not seek a recovery of funds previously paid to the state. They seek an injunction forcing the state officials to remedy their alleged ongoing violation of federal law as a result of its current, and ongoing, failure to (1) determine whether the annual settlement fund payments exceed the amount expended by the state for medical assistance for tobacco related illnesses, and (2) distribute any "overage" to Medicaid recipients. The fact that the plaintiffs' claims depend in part upon past conduct by the state (entering into the M.S.A. which entitles the State to payment of funds in the future) is not dispositive. Like the equal protection claim in *Papasan,* which the Court determined to be permissible under *Ex parte Young,* the plaintiffs' claims in this case seek to remedy an ongoing violation of federal law. *See Harris,* 264 F.3d at 1291. Because the plaintiffs seek to remedy an ongoing violation of federal law, their claims fall squarely within the *Ex parte Young* doctrine.

We also reject the defendants' efforts to bring the plaintiffs' claims within the *Coeur d'Alene* exception to *Ex parte Young.* *See Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In *Coeur d'Alene,* the Court held that the state interests at stake were so closely tied to the essence of state sovereignty that it could not maintain the fiction that the officers, rather than the state, were the real parties in interest. *Id.* at 287–88, 117 S.Ct. 2028.

We have interpreted *Coeur d'Alene* narrowly, and have rejected efforts to expand the list of core sovereignty exceptions to *Ex parte Young.* *See, e.g., Goldberg v. Ellett (In re Ellett),* 254 F.3d 1135, 1144 (9th Cir.2001) ("[A]pplication of the narrow exception to *Ex parte Young* carved out by *Coeur d'Alene* requires an assessment of the intrusion on state sovereignty of the *specific relief* requested by the plaintiff, not whether the relief merely *relates to* a more general area of core state sovereign interest.") (emphasis in original).

In this case, the defendants argue that the state's "sacred" duty "to provide for the health and welfare of its residents" places the plaintiffs' claims within the *Coeur d'Alene* core sovereignty exception to *Ex parte Young.* We are unpersuaded. Applying the *Coeur d'Alene* exception to bar this action because it affects the state's interest in providing for the public health and welfare would allow the *Coeur d'Alene* exception to swallow the *Ex parte Young* rule. *But see, Barton,* 293 F.3d at 951 (holding that "[i]nterference with the allocation of state funds, where Congress has expressly enacted that states may allocate such funds as they please, is an interference with a 'special sovereign interest' under *Coeur d'Alene.*"). We thus conclude that the plaintiffs' suit is not barred by sovereign immunity under the Eleventh Amendment.

## IV.

The district court dismissed the plaintiffs' lawsuit on the ground that it was barred by sovereign immunity. We may affirm, however, on any ground supported by the record. *Herring v. FDIC,* 82 F.3d 282, 284 (9th Cir.1996). "Although an appellate court normally addresses only those issues resolved below, the court may, in its discretion, review an issue 'conceded or neglected below if the issue is purely

one of law and the pertinent record has been fully developed, ... [or] when there are significant questions of general impact.'" *United States v. California,* 932 F.2d 1346, 1347–48 (9th Cir.1991) (quoting *Howell v. State Bd. of Equalization (In re Howell),* 731 F.2d 624, 626–27 (9th Cir. 1984)) (alteration in original). We have received supplemental briefing from the parties regarding the merits of the plaintiffs' claims. Both parties agree that whether the plaintiffs' complaint states a claim is a question of law, and that the record before us is adequate to decide the issue of the applicability of 42 U.S.C. § 1396k(b). Thus, we now consider whether the plaintiffs, as a matter of law, can state a claim for relief based upon the State of Hawai'i's failure to distribute any portion of the M.S.A. funds to Medicaid recipients.

At the time of the 1998 MSA, federal law applicable to a state's recovery of Medicaid funds provided that where a state had pursued an assigned claim and recovered from a legally liable third party, the State was required to allocate distribution of those funds as follows: "(a) To itself, an amount equal to State Medicaid expenditures for the individual on whose right the collection was based. (b) To the Federal Government, the Federal share of the State Medicaid expenditures .... (c) To the recipient, any remaining amount." 42 C.F.R. § 433.154; *see also* 42 U.S.C. § 1396k(b).

In 1999, in response to the 1998 settlement of the tobacco litigation, Congress passed amendments to the federal Medicaid law which specified the way in which states were required to distribute M.S.A. settlement funds. First, Congress provided that the States did not have to reimburse the federal government for its portion of Medicaid costs for tobacco related medical expenses. 42 U.S.C.

§ 1396b(d)(3)(B)(i). This provision effectively eliminated any claim by the federal government to a share of the M.S.A. settlement funds.

Second, and most important to the plaintiffs' claims in this case, Congress provided that, with an exception not relevant here, "a State may use amounts recovered or paid to the State as part of a comprehensive or individual settlement, or a judgment, described in clause (i) [the 1998 M.S.A. tobacco settlement] for any expenditures determined appropriate by the State." 42 U.S.C. § 1396b(d)(3)(B)(ii). The defendants argue that this clause (ii) of § 1396b(d)(3)(B) overrides the ordinary distribution rule of § 1396k(b), and precludes any claim by the plaintiffs to a share of the M.S.A. funds. The plaintiffs contend, by contrast, that clause (ii) of § 1396b(d)(3)(B) merely clarifies that the federal government has no claim to any portion of the M.S.A. settlement funds, and leaves intact the distribution rule of § 1396k(b).

Our starting point in determining whether § 1396b(d)(3)(B)(ii) overrides the distribution rule of § 1396k(b) is the plain language of the statute. *Children's Hosp. and Health Ctr. v. Belshe,* 188 F.3d 1090, 1096 (9th Cir.1999). "[W]e examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Id.* If the plain meaning of the statute is unambiguous, that meaning is controlling and we need not examine legislative history as an aid to interpretation. *Id.*

Here, no ambiguity exists. By its express terms, § 1396b(d)(3)(B)(ii) allows the State of Hawai'i to "use amounts recovered or paid to the State as part of a comprehensive or individual settlement ... for any expenditures determined appropriate by the State." This language is neither expressly nor impliedly limited to the por-

tion of the settlement funds that would otherwise be recoverable by the federal government.

Our sister circuits agree. They have uniformly held that the plain language of § 1396b(d)(3)(B)(ii) authorizes states to use all of the tobacco settlement funds received by them for any purpose they see fit, and frees them from complying with the ordinary Medicaid disbursement provisions of § 1396k(b). *Accord Strawser,* 290 F.3d at 731; *Tyler,* 280 F.3d at 122–23; *Greenless,* 277 F.3d at 608–09; *Harris,* 264 F.3d at 1296. As explained by the Fourth Circuit, "[t]his provision permits a state to use 'amounts recovered or paid ... for *any* expenditure', and does not qualify the term 'amounts.' There is no ambiguity in this sentence: Congress declares that the states may spend any money they receive under the M.S.A. on any expenditure." *Strawser,* 290 F.3d at 731. We join our sister circuits and hold that the plain language of 42 U.S.C. § 1396b(d)(3)(B)(ii) forecloses the plaintiffs' claims.[5]

The plaintiffs argue we should not reach this result because there is nothing in the legislative history to demonstrate that Congress intended the § 1396b(d)(3)(B)(ii) amendment to divest individual Medicaid recipients of the rights they had to distribution of any "overage" under § 1396k(b). The language of the amendment is clear, however, and thus we do not resort to legislative history to ascertain Congress's intent. *Children's Hosp.,* 188 F.3d at 1096.

█ The plaintiffs also argue that giving effect to the specific distribution rule for tobacco settlement funds, set forth in § 1396b(d)(3)(B)(ii), constitutes an implied repeal of the general distribution rule of § 1396k(b), and that, because implied repeal is disfavored, we must avoid this construction. The presumption against implied repeal, however, is most applicable when the "repeal" significantly modifies the earlier statute. *Strawser,* 290 F.3d at 733. In contrast, when a specific statute carves out an exception to a general statute, the "specific statute will not be controlled or nullified by [the] general one, *regardless of the priority of enactment."* *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (emphasis added) (citations omitted). We therefore agree with the Second Circuit's well-stated analysis:

> Although the 1999 amendment conflicts with § 1396k(b) with respect to individual recovery under the tobacco settlement, "both will be given effect if the general language of [§ 1396k(b)] be construed as applying generally and [the 1999 amendment] be construed as creating an exception to its general application."

*Strawser,* 290 F.3d at 733 (quoting *Niagara Fire Ins. Co. of New York v. Raleigh Hardware Co.,* 62 F.2d 705, 709 (4th Cir. 1933)) (alterations in original).

We conclude that the plain language of § 1396b(d)(3)(ii) bars the plaintiffs' claims to any portion of the M.S.A. settlement funds; and we affirm, on that ground, the judgment of the district court dismissing the plaintiffs' complaint.

AFFIRMED.

O'SCANNLAIN, Circuit Judge, concurring in part and concurring in the judgment:

I join the court's opinion with the exception of Part III. I would hold, as did the

---

5. Because we conclude that the plain language of § 1396b(d)(3)(B)(ii) forecloses the plaintiffs' claims, we need not address the alternative rationale advanced by the defendants, and relied upon by the Seventh and Eleventh Circuits in *Floyd,* 227 F.3d at 1036 and *McClendon,* 261 F.3d at 1261, based upon the scope of the plaintiffs' assignment of rights under § 1396k(b) and state law.

district court, that this action is in essence a suit for damages against the State of Hawai'i and, therefore, is barred by the Eleventh Amendment. Nonetheless, I agree that, as Part IV of the court's opinion concludes, the 1999 amendments to the Medicaid statute extinguish any possible claim by the plaintiffs to a portion of future tobacco settlement payments, and I concur in the judgment to that extent.

The court holds that plaintiffs' claims are within the *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441 (1908) exception because they seek remedy for a present and ongoing violation of federal law. In its analysis, the majority declines to follow the Sixth Circuit's holding in *Barton*, 293 F.3d 944 (6th Cir.2002) that plaintiffs' claims are an attempt to recover retrospective relief in the form of money damages, and therefore barred. I am persuaded that *Barton* should apply here and therefore believe that the State of Hawai'i has a present vested right in the settlement funds.

In distinguishing between permissible prospective, and impermissible retrospective, relief, "attempts to seize upon a state's 'continuing income' by means of a prospective injunction have been held by the Supreme Court to be attempts to obtain compensation for an 'accrued monetary liability.'" *Barton*, 293 F.3d at 949 (citing *Papasan*, 478 U.S. at 281, 106 S.Ct. 2932). Simply because it receives settlement funds in installments, the state's present entitlement to these future payments is neither negated nor diminished.

Nevertheless, the majority concludes that because payments from the settlement funds, as well as state allocation of these payments, are to be made in the future, plaintiffs' claims for portions of these future payments fall within the *Ex Parte Young* exception. I respectfully disagree. For the purposes of the Eleventh Amendment, we must decide whether the relief being sought is prospective or retro-

spective, and the mere fact that payments occur in fixed future installments rather than a lump sum is not dispositive of the issue. The state obtained a vested interest in the payment of the settlement when it entered into the Master Settlement Agreement ("MSA"), regardless of whether it took payment in a lump sum or in installments. As a result, plaintiffs impermissibly seek to recover money damages from the State of Hawai'i: "there is no other purpose underlying the requested 'injunctive' relief other than the recovery of cash that is the property of the state. It is therefore barred by the Eleventh Amendment." *Barton*, 293 F.3d at 950.

Alternatively, I would hold plaintiffs' claims to be barred under the *Coeur d'Alene* exception to *Ex Parte Young*. The Supreme Court in *Idaho v. Coeur d'Alene* held that even claims for prospective relief would be barred if "special sovereignty interests" were implicated. 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Allocation of state funds is generally an important state interest. Where, as here, Congress has enacted a statutory provision that specifically allows states to allocate M.S.A. proceeds as they deem appropriate, 42 U.S.C. 1396b(d)(3)(B)(ii), I agree with the court in *Barton* that plaintiffs' attempt to force the allocation of state funds "is an interference with a 'special sovereign interest' under *Coeur d'Alene*." 293 F.3d at 951.

Accordingly, I would decline to reach the merits of plaintiffs' claims under 42 U.S.C. § 1396k(b). I would affirm on the basis that plaintiffs' claims are barred by the Eleventh Amendment, because they impermissibly seek retrospective relief, or in the alternative, implicate core state sovereign interests.