**Lois STRAWSER, et al., Plaintiffs,**

v.

**Elizabeth S. LAWTON,
et al., Defendants.**

**No. CIV.A. 2:00–0073.**

United States District Court,
S.D. West Virginia,
Charleston Division.

Jan. 3, 2001.

Troy N. Giatras, Giatras & Webb, Robert J. Gould, Charleston, WV, Richard A. Bieder, Antonio Ponvert, III, Koskoff, Koskoff & Bieder, PC, Bridgeport, CT, Larry McDevitt, Van Winkle, Buck, Wall, Starnes and Davis, P.A., Asheville, NC, John A. Hagins, Jr., Covington, Patrick,

Hagins, Stern & Lewis, P.A., Greenville, SC, for Plaintiffs.

John F. McCuskey, Shuman, McCuskey & Slicer, Charleston, WV, for Defendants Elizabeth S. Lawton, Darrell W. Peters and Joan E. Ohl.

Frances A. Hughes, Office of the Attorney General, Charles R. Bailey, Esquire, Bailey & Wyant, P.L.L.C., Charleston, WV, for Defendant Darrell V. McGraw, Jr.

Randall L. Trautwein, Benu Rellan, Lamp, O'Dell, Bartram, Levy & Trautwein, PLLC, Huntington, WV, for Defendant Citibank N.A.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are (1) separate motions to dismiss filed by Defendants (a) Elizabeth S. Lawton, Darrell W. Peters, and Joan E. Ohl, (b) Darrell McGraw, and (c) Citibank N.A.; (2) Plaintiffs' motion for oral argument; and (3) Defendants' motions to stay discovery pending disposition of their dispositive motions.

The Court **GRANTS** the motions to dismiss, **DENIES** the motions to stay as moot, and **DENIES** Plaintiffs' motion for oral argument.[1]

### I. FACTUAL BACKGROUND

In 1994, West Virginia Attorney General Darrell V. McGraw, Jr., on behalf of his statutory clients at the West Virginia Public Employees Insurance Agency (PEIA) and the West Virginia Department of Health and Human Resources (DHHR), instituted an action against the major tobacco companies and other Defendants in the Circuit Court of Kanawha County. The complaint stated claims for (1) unjust enrichment and restitution, (2) indemnity, (3) public nuisance, (4) fraud and approximately ten (10) other claims. The relief

---

1. The facts and legal theories are adequately briefed and oral argument would not materi- ally aid the decisional process.

sought was broad, including compensatory and punitive damages, an injunction prohibiting the promotion of tobacco products to minors, and disgorgement of profits from the sale of cigarettes in West Virginia.

In November 1998, the tobacco companies and all but four states entered into a Master Settlement Agreement (M.S.A.) valued at an immense $200 billion dollars. The M.S.A., in part, compensates the states for past and future medical expenses occasioned by state underwritten treatment of tobacco-related illnesses. Payments under the M.S.A. will be made to the states over two and one-half decades. The M.S.A. does not resolve and release claims for "private or individual relief for separate and distinct injuries ... or ... recovery of health-care expenses" by individuals. (M.S.A. at II(pp)(2)(A) & (B).)

Over the last two years, West Virginia has received approximately $40 million dollars under the M.S.A. The money is transferred by the settling tobacco companies to an escrow agent, Citibank. Citibank then transfers a proportionate share of the monies to the State of West Virginia.

The West Virginia Legislature acted with dispatch to assert its sovereign control over the West Virginia portion. *See* W.Va.Code § 4–11A–1(c) *et seq.* ("The receipt of funds in accordance with the master settlement agreement shall be deposited only in accordance with the provisions of this article.") By this enactment, the Legislature exercised control over the earmarking and disbursement of the settlement proceeds.[2]

Plaintiffs are Medicaid recipients who were harmed by tobacco products. Despite section 4–11A–1(c) *et seq.*, they seek an Order from this Court prescribing how West Virginia's nearly $2 billion share of the M.S.A. fund should be allocated, partially to their benefit.

## II. DISCUSSION

### A. Medicaid Program Background

The Medicaid program was established in 1965 as "a cooperative federal-state" venture providing monies for medical care to needy individuals. *See Prestera Ctr. for Mental Health Servs. v. Lawton,* 111 F.Supp.2d 768, 773 (S.D.W.Va.2000)(quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)). One commentator describes the system aptly, asserting it:

> cast[s] state officials in the role of middlemen entrusted with the distribution of combined federal-state largesse to eligible beneficiaries. A state is under no legal obligation to utilize federal funds to meet the needs of its disadvantaged citizens. If it chooses to avail itself of such funds, however, it must expend them in a manner consistent with the federal statutes and regulations governing their use.

Leonard Weiser–Varon, Note, *Injunctive Relief from State Violations of Federal Funding Conditions,* 82 Colum. L.Rev. 1236, 1237–38 (1982).

When a state violates any condition governing the use of federal funds, the responsible federal official must terminate the funding to the state program, after providing notice and an opportunity to be heard. 42 U.S.C. § 1396c. The applicable conditions most often appear in a state plan, a comprehensive document Congress has directed each participating state to file. One such plan condition states:

> A State plan for medical assistance must—.... (25) provide—(A) that the State ... administering such plan will take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services avail-

---

**2.** The very enactment of the statute poses a grave problem for Plaintiffs in circumnavigating the Eleventh Amendment.

able under the plan ... [and] (B) that in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State ... will seek reimbursement for such assistance to the extent of such legal liability.

42 U.S.C. § 1396a(a)(25). Subsection 1396a(a)(45) provides further:

A State plan for medical assistance must—.... (45) provide for mandatory assignment of rights of payment for medical support and other medical care owed to recipients, in accordance with section 1396k of this title.

*Id.* Title 42 U.S.C. section 1396k(b), the statute upon which Plaintiffs principally rely, discusses the disbursement of monies recovered by states from liable third parties:

Such part of any amount collected by the State under an assignment made under the provisions of this section shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance), *and the remainder of such amount collected shall be paid to such individual.*

42 U.S.C. § 1396k(b) (emphasis added).

Plaintiffs' claims are straightforward. They assert (1) the tobacco companies are third parties liable to Medicaid recipients injured by cigarettes; (2) the recipients assigned their claims to the State; (3) the State's suit against the tobacco companies was a Medicaid reimbursement action pursuant to subsection 1396k(b); (4) there is a "remainder" from the settlement with the tobacco companies under subsection 1396k(b); and (5) West Virginia has a mandatory obligation to pay over the re-

mainder to Medicaid recipients injured by tobacco products. The State Defendants' principal argument for dismissal is that Plaintiffs' requested relief would amount to a retroactive award of damages against the State in violation of the Eleventh Amendment.

## B. Eleventh Amendment Immunity From Suit

"Although the Constitution establishes a National Government with broad, often plenary authority over matters within its recognized competence, the founding document 'specifically recognizes the States as sovereign entities.'" *Alden v. Maine*, 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)(quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n. 15, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). Upon ratification of the Constitution, the States thus enjoyed "'a residuary and inviolable sovereignty.'" *Alden*, 527 U.S. at 715, 119 S.Ct. 2240 (quoting *The Federalist* No. 39, at 245 (James Madison)).

This understanding of the states' role in the early years of the Republic perhaps explains the Nation's "profound shock" following the Supreme Court's 1793 decision in *Chisholm v. Georgia*, 2 U.S. 419, 2 Dall. 419, 1 L.Ed. 440 (1793). *Chisholm* held that Article III of the Constitution authorized a private citizen of another State to sue the State of Georgia without its consent. Congress and the States responded swiftly with the Eleventh Amendment.

The Amendment provides in pertinent part that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." *Id.* Despite its text, the Amendment has been construed also to prevent citizens from bringing federal claims in a federal court against their own states. *See Hans v. Louisiana*, 134 U.S. 1, 14–15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

■ The Amendment is much more than a constitutional prohibition to prevent a drawdown of a state fisc via federal litigation. Our Court of Appeals recently observed that "Inherent in [our] federal structure is the mutual, reciprocating respect for the state and federal sovereigns, and *forcing one sovereign to appear against its will in the courts of another violates this respect." Litman v. George Mason University,* 186 F.3d 544, 549 (4th Cir.1999) (emphasis added) (noting the Amendment serves not only the purpose of avoiding raids on the state treasury, but also " 'the indignity of subjecting a State to the coercive process of [federal] judicial tribunals at the instance of private parties.' ")(quoted authority omitted).

■ There are certain limited situations, however, where the Amendment does not apply. For example, the *Ex parte Young* doctrine permits a private citizen to sue state officers in federal court "to ensure that the officer's conduct is in compliance with federal law." *Seminole Tribe,* 517 U.S. at 71 n. 14, 116 S.Ct. 1114. In *DeBauche v. Trani,* 191 F.3d 499, 505 (4th Cir.1999), however, our Court of Appeals restated the obvious corollary to this doctrine:

> The ... exception ... applies *only when [1] there is an ongoing violation of federal law* that [2] can be cured by prospective relief. It does not apply when the alleged violation of federal law occurred entirely in the past. *See Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (observing that "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment"); *Republic of Paraguay v. Allen,* 134 F.3d 622, 627 (4th Cir.1998) (noting that the *Ex parte Young* exception applies only when "(1) *the violation for which relief is sought is an ongoing one,* and (2) the relief sought is only prospective" (citations omitted)).

*Id.* (emphasis added).

■ Plaintiffs attempt to invoke *Ex Parte Young* to avoid the Eleventh Amendment. Both parties' arguments, however, revolve around whether the relief sought by Plaintiffs is prospective or retrospective in nature.

Although all federal courts to date addressing that question in Medicaid recipient actions for recovery of tobacco settlement money have ruled in favor of state officers, the analysis is complex and somewhat enigmatic. *See Floyd v. Thompson,* 227 F.3d 1029, 1031 (7th Cir.2000) ("While we think it possible that the district court's Eleventh Amendment analysis was correct, the answer is not obvious, and we find it unnecessary to delve into the complexities of that area of law."). The instant briefing ignores the more direct, first prong of the *Ex parte Young* analysis, namely whether there is an ongoing violation of federal law.

The putatively violated federal law Plaintiffs rely upon is 42 U.S.C. § 1396k. Section 1396k(b) provides pertinently that any remainder from State collection efforts against liable third parties, after appropriate reimbursement of the Federal Government, "shall be paid to" affected recipients. Congress, however, has changed the statutory scheme where tobacco settlement funds are involved.

■ In Title III of the 1999 Emergency Supplemental Appropriations Act, ch. 11, 113 Stat. 57 (1999) (codified as amended at 42 U.S.C. § 1396b(d)(3)(B)(i) and (ii)), Congress addressed the National Governors Association's "highest priority" for the pending session, namely "protecting state tobacco settlement funds .... from federal seizure." Pls.' ex. 12 at 1. The new statute provides:

> (i) Subparagraph (A) [dealing with the federal pro rata share of net recoveries by a state plan to which the United States is equitably entitled] and paragraph (2)(B) [dealing with treatment of reimbursements by liable third parties to the State for injured recipient expenditures] shall not apply to any amount

recovered or paid to a State as part of the comprehensive settlement of November 1998 between manufacturers of tobacco products ... and State Attorneys General, or as part of any individual State settlement or judgment reached in litigation initiated or pursued by a State against one or more such manufacturers.

(ii) Except as provided in subsection (i)(19) [providing for state payment of litigation costs and expenses of pursuing the tobacco litigation], *a State may use amounts recovered or paid to the State as part of a comprehensive or individual settlement, or a judgment, described in clause (i) for any expenditures determined appropriate by the State.*

42 U.S.C. § 1396b(d)(3)(B)(i) and (ii) (emphasis added).

Plaintiffs assert this amendment "pertains only to whether [the Healthcare Finance Administration] may treat tobacco settlement payments as an overpayment to the States for the purpose of offsetting future federal Medicaid matching funds."[3]

**3.** Plaintiffs also assert the only purpose of the underscored language in subsection (ii) was to "distinguish the Bill from competing legislation that would have required the States to use 'a portion of such funds for tobacco use prevention and health care and early learning programs.'" Mem. in Opp'n at 21 (citing 145 Cong. Rec. S2503). Plaintiffs' citation does not lead ineluctably to that conclusion.

The citation is to a bill introduced by Senator Edward Kennedy that would have permitted the Secretary of Health and Human Services to waive recoupment of settlement funds received by a State if a portion was used for tobacco use prevention, health care, and early learning programs. There is no mention of competing legislation. Furthermore, Senator Kennedy himself stated in introductory remarks that "While the federal government could legally demand that the states reimburse Washington from their settlements, *I believe the states should be allowed to keep one hundred percent of the money.*" 145 Cong. Rec. S2503–05 (Mar. 10, 1999)(emphasis added).

**4.** In making its ruling, the Court is aware of "the 'cardinal rule ... that repeals by implication are not favored.'" *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936). Indeed, "An implied

(Mem. in Opp'n at 20.) Plaintiffs also construe the language to mean "the states are free to spend their *legal* portion of the tobacco settlement on whatever they see fit." (*Id.* at 21)(emphasis added).

Plaintiffs' proposed interpretations of subsection (ii) do not find support in the comparatively unembellished statutory language. Indeed, no construction or divination of Congressional intent is necessary. *See, e.g., United States v. Murphy,* 35 F.3d 143, 145 (4th Cir.1994)("[I]f the statutory language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and ... the sole function of the courts is to enforce [the statute] according to its terms.").

In the Court's view, the statute is an unambiguous Congressional mandate vesting in the participating states a complete right, title, and interest to the settlement proceeds, excepting only litigation expenses. Hence, there is no ongoing violation of federal law, and *Ex parte Young* is inapplicable.[4]

amendment or partial repeal of a statute will not be recognized by the courts, unless it clearly appears the legislature so intended." *United States v. Joya–Martinez,* 947 F.2d 1141, 1144 (4th Cir.1991). Plaintiffs assert that resort to section 1396b(d)(3)(B)(ii) to trump section 1396k(b) would amount to a finding that Congress impliedly amended the latter with the former. The Court disagrees.

At the outset, section 1396b(d)(3)(B)(ii) may be incorrectly characterized as an implied amendment or partial repeal for at least two different reasons. First, the new statute might simply be a final statement of Congressional intent as to the disposition of tobacco settlement funds without reference to section 1396k(b). Second, one could reasonably assert a recipient-reimbursement obligation arises only after the state has obtained a judgment after a finding of legal liability. *See* 42 U.S.C. § 1396a(a)(25) (discussing the concept of "legal liability"). Congress' statement concerning disposition of *settlement* proceeds then, would be a different matter entirely.

Even assuming section 1396b(d)(3)(B)(ii) is properly characterized as an implied amendment or partial repeal, it is equally well-settled that "An intent to repeal can be implied .... from 'irreconcilable conflict' between en-

Accordingly, the Court **GRANTS** the State Defendants' motion to dismiss. Further, Defendant Citibank's obligation to pay over monies to Plaintiffs from the settlement comes into play only if the Eleventh Amendment does not bar the payment. Consequently, based on the State Defendants' successful claim of immunity, the Court likewise **GRANTS** Citibank's motion to dismiss.

### C. Other Issues

The Court has chosen but one of a host of analyses warranting dismissal of Plaintiffs' claims. It is worth noting briefly some of the other grounds upon which dismissal might lie.

#### 1. Limited Assignment Analysis

■ In *Floyd v. Thompson*, 227 F.3d 1029 (7th Cir.2000), the Court of Appeals for the Seventh Circuit posed a very cogent question concerning the extent of the limited assignment given the state by its Medicaid recipients:

> But what exactly was assigned in Wisconsin? If the only thing the individuals assigned was their right to recover the amounts paid by the Medicaid program—not their right to recover any excess—then there is nothing left to distribute to them to which they could have any claim.

actments." *United States v. King*, 824 F.2d 313 (4th Cir.1987)(quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)); *Patten v. United States*, 116 F.3d 1029, 1034 (4th Cir.1997). Statutory provisions will be considered to be in irreconcilable conflict when there is a " 'positive repugnancy' " between them such that they " 'cannot mutually coexist.' " *Mitchell*, 39 F.3d at 472 (quoted authority omitted). Section 1396k(b) provides generally that in a State reimbursement action against a liable third party, any "remainder" present after reimbursement of the state and federal share "shall be paid to" the recipient who assigned the claim to the State. *Id.* In relation to the tobacco settlement, however, Congress specifically and explicitly stated in section 1396b(d)(3)(B)(ii) that the states could "use amounts recovered or paid to the State as part of [the] ... settlement ... *for any expenditures determined appropriate by the*

*Floyd*, 227 F.3d at 1035. The answer to that question in West Virginia proves fatal to Plaintiffs' claims. West Virginia's assignment statute provides:

> Submission of an application to the department of health and human resources for medical assistance is, as a matter of law, an assignment of the right of the applicant or legal representative thereof, to recovery from personal insurance or other sources, including, but not limited to, liable third parties, *to the extent of the cost of medical services paid for by the medicaid program.*

W. Va.Code § 9–5–11 (emphasis added).

The underscored language demonstrates Plaintiffs only partially assigned to the State their claims against any liable third party tobacco defendants. Specifically, Plaintiffs assigned their claims only as to the monies the State expended for their medical treatment, the State share under Section 1396k(b). Accordingly, there is no possibility of a "remainder" under Section 1396k(b) to which Plaintiffs are entitled.

Plaintiffs yet hold the balance of their claims beyond what the State had to pay to care for them. These claims may be asserted at any time, subject to defenses asserted by the tobacco companies. The M.S.A. and West Virginia law specifically

*State." Id.* (emphasis added). One has difficulty imagining a more clear-cut, explicit conflict. A State cannot use the "amounts recovered or paid ... for any" purpose if it has a corresponding obligation to take a portion and disburse it to compensate recipients as commanded by 1396k(b). So read, the two provisions are in direct and irreconcilable conflict.

Third, Plaintiffs have not addressed whether the strong presumption against implied amendments retains its full vigor when the implied amendment acts to diminish a private citizen's showing of an ongoing violation of federal law under *Ex parte Young*. It would seem the presumption might yield, or at least diminish in strength, in the face of what amounts to a private citizen's attempt to hale a state sovereign into federal court to respond with what strongly resembles a retroactive monetary award.

preserve Plaintiffs' individual rights of action. *See also* W. Va.Code § 9–5–11(b) ("Nothing in this section shall be construed so as to prevent the recipient of medical assistance from maintaining an action for injuries received by him against any other person and from including therein, as part of the compensatory damages sought to be recovered, the amount or amounts of his or her medical expenses, even though such person received medical assistance in the payment of such medical expenses, in whole or in part.").

## 2. Enforcement via Section 1983

 In light of section 1396b(d)(3)(B)(ii) and other considerations, it is questionable whether Plaintiffs may now use section 1983 to enforce their claim of a property right to settlement funds via section 1396k(b).[5] The violation of a federal statute is not actionable under section 1983 if either one of the following is true: (1) the statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983, or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Doe*, 225 F.3d at 447. In determining whether a statute creates an individual, enforceable right, this Court applies a well-settled, three-part test:

█ Did Congress intend the statutory provision to benefit plaintiff? [2] Is the

ostensible right so "vague and amorphous" that its enforcement would prove difficult? And, [3] is the statutory provision at issue phrased in mandatory rather than discretionary terms?

*Id.* at 448; *Prestera*, 111 F.Supp.2d at 773–74. Plaintiffs encounter significant problems on the first and second factors.

Regarding the first, Congress' addition of 1396b(d)(3)(B)(ii) at least muddies the question of whether the Plaintiffs were intended beneficiaries in light of the entire statutory scheme. As previously discussed, that amendment treats tobacco settlement monies differently than other state third-party liability recovery actions.

█ Regarding the second factor, Plaintiffs' claims, reduced to their essence, assert a right to "that portion of the tobacco litigation settlement proceeds that belongs to" them. Pls.' Compl. at 22. The United States Court of Appeals for the Seventh Circuit commented recently on the enforcement of that putative right:

We add that the administrative problems that would be created by [permitting the claims to go forward] would be nightmarish. As Wisconsin and the other states point out, the total sums of money to be paid under the M.S.A. are not earmarked for different claims. Some of it is to go to educational pro-

---

**5.** The Court does not share Plaintiffs' conclusory assertion that utilizing subsection 1396b(d)(3)(b)(ii) "would raise serious retroactivity problems." Opp. Memo. at 22. "The amendment applies to amounts paid to a State prior to, on, or after the date of the enactment of this Act." 1999 Emergency Supplemental Appropriations Act, chap. 11, 113 Stat. 57 (1999)(codified as amended at 42 U.S.C. § 1396b(d)(3)(B)(i) and (ii)). The question that first arises is whether a retroactivity analysis is warranted in this specific context. *See Booth v. Maryland*, 112 F.3d 139, 142 (4th Cir.1997)("In *Green v. Mansour*, for example, the Court ruled that any possible violation of federal law ended when the relevant federal statute was changed, so *Ex Parte Young* could not apply and the Eleventh Amendment barred the action.").

Assuming retroactivity analysis applies, our Court of Appeals has stated "the Due Process

Clause of the Fifth Amendment allows retroactive application of either federal or state statutes as long as the statute serves a legitimate legislative purpose that is furthered by rational means." *Shadburne–Vinton v. Dalkon Shield Claimants Trust*, 60 F.3d 1071, 1076 (4th Cir.1995). The amendment's paramount purpose was to facilitate implementation of the global resolution of a complex, expensive, and highly contentious litigation among nearly all the states and many tobacco companies. The amendment was spurred by the states' concern their hard-gained settlement proceeds would dwindle in the face of claims by others to M.S.A. monies. Congress chose a rational means to allay those legitimate concerns with the amendments contained in the 1999 Supplemental Appropriations Act.

grams; some of it to research; some to reimbursement of the state's expenses in treating sick people and in supporting families whose wage-earners are disabled from smoking; some is frankly punitive. The final amount to be paid, after 25 years have elapsed, is unknown and unknowable at this point, because it depends partly on how successful the anti-smoking campaigns turn out to be.

*Floyd,* 227 F.3d at 1038; *see also Evergreen Presbyterian Ministries Inc. v. Hood,* 235 F.3d 908, 924 (5th Cir.2000)(noting the unavailability of § 1983 for enforcement of statutory rights where "enforcement would strain judicial competence"). Plaintiffs' asserted right here is subject to the same enforcement obstacles noted in *Floyd.*

### 3. The Second Prong of *Ex Parte Young*

While the Court bases its analysis for dismissal on Plaintiffs' failure under the first prong of *Ex Parte Young,* virtually every court addressing the issue to date has employed the second prong to dismiss on Eleventh Amendment grounds. *See, e.g., Floyd v. Thompson,* 111 F.Supp.2d 1097, 1101 (W.D.Wis.1999)("Allowing plaintiffs to recover a portion of the settlement funds would be the functional equivalent of retrospective monetary damages paid from the state treasury[.]"); *Martin v. State of New Mexico,* 197 F.R.D. 694 (D.N.M.

**6.** Plaintiffs assert the Court can avoid the bar represented by the second prong of the Eleventh Amendment analysis by way of an inventive fiction. In sum, Plaintiffs invite the Court to order a payout from escrow agent Citibank after its receipt of funds from the Tobacco companies, but before transmission of the monies to the State's coffers.

Plaintiffs' analysis is greatly oversimplified. For example, it ignores the concept of bifurcated title. While the tobacco-company depositors retain legal title to the monies once escrowed, West Virginia likely enjoys equitable title to the funds, subject only to computation and award of its allocable share. Plaintiffs avoid discussion of the treatment of this ownership interest under the Eleventh Amendment.

2000); *McClendon v. Georgia Dep't of Commun. Health,* 4:00cv26–HLM (N.D.Ga. Aug. 28, 2000); *Downs v. Commonwealth,* No. 00–23 (E.D.Ky. Aug. 31, 2000); *White v. Hunt,* 5:00cv14–V (W.D.N.C. Jul. 13, 2000); *Barton v. Summers,* 111 F.Supp.2d 989 (M.D.Tenn.2000); *Harris v. Owens,* No. 99–S–953 (D.Colo. Jan. 19, 2000)(Magistrate Judge's Report–Recommendation adopted Jul. 19, 2000). In the alternative, the Court also adopts the analyses performed by these courts.[6]

### III. CONCLUSION

Based on the foregoing, the Court **GRANTS** the motions to dismiss, **DENIES** the motions to stay as moot, and **DENIES** Plaintiffs' motion for oral argument.

The Clerk is directed to (1) post a copy of this Memorandum Opinion and Order on the Court's public website at www.wvsd.uscourts.gov and (2) send a copy to counsel of record.

From a more practical standpoint, Plaintiffs' proposed result would open a gaping hole in the public fisc. It would permit, by analogy, any seeker of state funds to look for accounts receivable of the State and then attempt to garnish them before their purely ministerial transmission to the treasury. Such a mechanism should not be engrafted onto our system of dual sovereignty.

Finally, Citibank is a mere agent of its many clients, the several sovereign states. Its possession of funds sought by Plaintiffs comes about only through the scope of its agencies. Defenses to and immunities available to its principals protect both the agent and the escrow.