Rockingham County Probate Court
No. 2001-189

IN RE ESTATE OF GERALDINE A. RADUAZO

Argued: June 12, 2002
Opinion Issued: December 18, 2002

*Philip T. McLaughlin*, attorney general (*Craig S. Donais*, assistant attorney general, on the brief and orally), for the State.

*Flynn & McGee, P.A*, of Portsmouth (*John P. McGee, Jr.* on the brief and orally), for the Estate of Geraldine A. Raduazo.

BROCK, C.J. The Estate of Geraldine Raduazo (Estate) appeals from an order of the Rockingham County Probate Court (*O'Neill*, J.) granting the State's motion for summary judgment and dismissing the Estate's petition for release of monies from the Medicaid lien. On appeal, the Estate argues that the State released its Medicaid lien against the Estate when it settled litigation against certain tobacco manufacturers in 1998. We reverse and remand.

As a preliminary matter, we note that the State styled the motion at issue as a motion to dismiss, or in the alternative, a motion for summary judgment. Because the trial court treated the motion as one for summary

judgment, we will do the same. In reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *See Del Norte, Inc. v. Provencher,* 142 N.H. 535, 537 (1997). "If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment." *Id.* (quotation and brackets omitted). Where no material issue of fact is in dispute, we will determine only whether the prevailing party was entitled to judgment as a matter of law. *Id.* We review the trial court's application of the law to the facts *de novo. Id.*

The record supports the following facts. Geraldine A. Raduazo died in December 1997. According to an affidavit filed in the probate court, Raduazo had been a lifelong smoker, and had developed severe health problems related to her smoking. Prior to her death, she received medical assistance through the State's Medicaid program. At the time of her death, records of the New Hampshire Department of Health and Human Services indicated that Medicaid had paid $169,765.16 toward her medical expenses. The State therefore filed a statutory lien in that amount on Raduazo's estate. *See* RSA 167:14 (2002).

The only asset in Raduazo's estate was her home. The sale of her home resulted in approximately $60,000 being available for distribution to the State in satisfaction of its Medicaid lien.

Before any monies were distributed to the State, it, along with forty-five other States and six territories, settled a lawsuit against a number of major tobacco companies in a Master Settlement Agreement (MSA). Under the MSA, the State will receive a stream of payments from the tobacco defendants valued at approximately $1.304 billion over twenty-five years.

The Estate petitioned the probate court for a declaration that the MSA released the State's lien on estate funds. The petition alleged that: (1) Raduazo assigned her rights of action against third parties when she received Medicaid, *see* RSA 167:14-a (2002); (2) the State took advantage of the assignment and made claims against major tobacco companies for smoking-related illnesses that led to Medicaid expenditures; and, therefore, (3) to the extent that the Medicaid expenditures made to Raduazo related to her smoking-related illnesses, and to the extent that the State has recovered from various tobacco companies for such expenditures, "justice, equity and general principles of subrogation" require that the State's lien against the Estate be deemed satisfied.

The State moved for summary judgment, arguing that the Estate's asserted right to recover the value of the State's statutory lien is not

supported by applicable law and is barred by sovereign immunity. In granting the motion for summary judgment, the court stated, in pertinent part:

> The tobacco lawsuit is unrelated to Ms. Raduazo's individual claim against any tortfeasor that may have contributed to her death. The prayer for avoidance of the state's lien is essentially a claim for monetary damages against the State and is barred by the doctrine of sovereign immunity. *Newell v. New Hampshire Division of Welfare*, 131 N.H. 88 (1988). Furthermore, there were several causes of action cited in the tobacco suit some of which are unrelated to the medicaid payments made by the State and the settlement is not allocated to specific causes of action and it is unascertainable what part, if any, is allocable to the medicaid payments made by the state. More importantly, the State in the tobacco suit sought damages for unreimburseable payments made by it through the medicaid program to or for persons suffering from tobacco related illnesses which in the Geraldine A. Raduazo estate would be approximately $112,000.00 that the State cannot collect if the remaining assets in the estate are paid to the State pursuant to its lien.

The Estate appealed to this court.

## I. Background

To facilitate an understanding of the issues involved in this appeal, we outline briefly the relevant Medicaid law, and the litigation and 1998 settlement between the State and the tobacco companies.

### A. Assignment of Rights Under Medicaid

Medicaid is a joint federal-state program that provides medical services to certain persons in need. 42 U.S.C.A. §§ 1396 *et seq.* (1992 & Supp. 2002); *Wilder v. Virginia Hosp. Assn.*, 496 U.S. 498, 502 (1990). Through Medicaid, the federal and state governments share the cost of reimbursing health care providers for the cost of treating individuals who are unable to pay for necessary medical care. The State of New Hampshire is obligated to administer its program pursuant to a plan approved by the Health Care Financing Administration that complies with the requirements set forth in the Medicaid Act and its implementing federal regulations. *See* 42 U.S.C.A. § 1396a (Supp. 2002); 42 C.F.R. §§ 430 *et seq.* (2001); *Wilder*, 496 U.S. at 502.

Some people require medical care as a consequence of an accident or illness for which a third party is liable. Federal law mandates that States

require Medicaid recipients to assign any rights they possess against such third parties to the State, and requires States to make reasonable efforts to collect on all third-party claims that are assigned. *See* 42 U.S.C.A. §§ 1396a(a)(25), 1396k(a)(1)(A) (1992). RSA 167:14-a complies with this mandate. At issue in this case is whether New Hampshire's lawsuit against certain tobacco manufacturers was based, at least in part, upon an assignment of rights pursuant to RSA 167:14-a.

### B. The Tobacco Litigation

New Hampshire filed suit against a number of major tobacco companies in 1997. The State alleged that the companies had committed a number of deceitful practices in violation of different State laws, and based its claim upon the following theories: fraudulent misrepresentation; fraudulent concealment; breach of warranty; public nuisance; negligent performance of voluntarily undertaken duty; RESTATEMENT (SECOND) OF TORTS § 389; restitution based upon unjust enrichment; violation of RSA chapter 356; violation of RSA chapter 358-A (Consumer Protection Act); and civil conspiracy (aiding and abetting). The State sought both damages and injunctive relief. The request for injunctive relief included a request that the companies disclose all research pertaining to the health effects of tobacco use, take affirmative steps to prevent the distribution of tobacco products to children, and disclose the nicotine content of tobacco products. The State also sought damages, including restitution, under RSA chapters 358-A and 356, enhanced compensatory damages, disgorgement of the pecuniary gains from the sale of tobacco products, and payment of the State's costs of providing medical care related to tobacco use to non-Medicaid indigent persons. Furthermore, although the petition did not set forth a separate cause of action under Medicaid law, it requested (among other relief) that the court "award[] monetary relief ... including but not limited to ... the State's costs under the Medicaid program of providing medical care related to tobacco use."

In late 1998, New Hampshire settled its lawsuit against the major tobacco companies in the MSA. In exchange for a stream of payments and a number of other concessions by the tobacco defendants, the State released the participating tobacco companies from "all Released Claims that the Releasing Parties directly, indirectly, derivatively or in any other capacity ever had, now have, or hereafter can, shall or may have ...." MSA ¶ XII(a)(1), (3). "Released Claims" are those

> (1) for past conduct, acts or omissions (including any damages incurred in the future arising from such past conduct, acts or omissions), those Claims directly or indirectly based on, arising

out of or in any way related, in whole or in part, to (A) the use, sale, distribution, manufacture, development, advertising, marketing or health effects of, (B) the exposure to, or (C) research, statements, or warnings regarding, Tobacco Products. . . .

(2) for future conduct, acts or omissions, only those monetary Claims directly or indirectly based on, arising out of or in any way related to, in whole or in part, the use of or exposure to Tobacco Products manufactured in the ordinary course of business, including without limitation any future Claims for reimbursement of health care costs allegedly associated with the use of or exposure to Tobacco Products.

MSA ¶ II (nn). "Releasing Parties"

means each Settling State and any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories hereto to release past, present and future claims, the following: (1) any Settling State's subdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions; and (2) persons or entities acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of the State, as opposed solely to private or individual relief for separate and distinct injuries, or (B) to the extent that any such entity (as opposed to an individual) is seeking recovery of health-care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed, directly or indirectly, by a settling State.

MSA ¶ II (pp).

*II. Discussion*

Citing the petition filed in the underlying tobacco litigation, the MSA, and State and federal Medicaid law, the Estate argues that it should be released from the Medicaid lien because the State recovered money from

the tobacco defendants through an assignment of rights from the decedent. The State argues: (1) that the Estate's claim for an offset is barred by the doctrine of sovereign immunity; and (2) the State's claims against the tobacco companies were not based upon any assigned causes of action.

*A. Sovereign Immunity*

We address first the sovereign immunity issue. Under the doctrine of sovereign immunity, the State cannot be sued in its own courts without its consent or permission. *Tilton v. Dougherty*, 126 N.H. 294, 297 (1985). We conclude that the doctrine does not apply in this case because the Estate is not suing the State for damages. Rather, the Estate's claim arose in the context of a probate court proceeding when, pending the executrix's filing of a first and final account, the proceeds of the Estate were held in escrow. The Estate's petition merely seeks a ruling that the State's Medicaid lien has been satisfied, such that the State is no longer entitled to the proceeds from the Estate. At issue here is not whether the Estate can encroach on the public treasury by reaching into the State's pocket, but, rather, whether the State should be permitted to reach into the Estate's pocket.

The cases the State relies upon to support its sovereign immunity argument are inapposite because they involved cases in which plaintiffs sought to require the States to distribute to the plaintiffs portions of tobacco settlement proceeds that *exceeded* the amount the State had paid for their tobacco-related injuries. *See, e.g., Strawser v. Lawton*, 126 F. Supp. 2d 994, 998-1001 (S.D. W. Va. 2001), *aff'd*, 290 F.3d 720 (4th Cir. 2002); *Barton v. Summers*, 111 F. Supp. 2d 989, 990 (M.D. Tenn. 2000), *aff'd*, 293 F.3d 944 (6th Cir. 2002). The Estate is not asserting a claim to any portion of the tobacco settlement which is in excess of the amounts necessary to pay back the State for its medical expenditures. Unlike the plaintiffs in *Strawser* and *Barton*, the Estate is not seeking to require the State to pay it a portion of the tobacco settlement funds. Rather, the Estate's position is that the State should be barred from collecting funds from the Estate to which the State claims it is entitled.

Furthermore, applying the doctrine in this case would not serve the doctrine's policy goals. When the legislature enacted RSA 99-D:1 in 1978, it codified the common law doctrine of sovereign immunity as the law of the State. *Tilton*, 126 N.H. at 298. Courts have explained the doctrine as a rule of social policy that serves two general public policy considerations: "the protection of the public against profligate encroachment on the public treasury, and the need for the orderly administration of government, which, in the absence of immunity, would be disrupted if the state could be sued at the instance of every citizen." *Berek v. Metropolitan Dade Cty.*,

396 So. 2d 756, 758 (Fla. Dist. Ct. App. 1981) (citations omitted); *see also City of Virginia Beach v. Carmichael Development*, 527 S.E.2d 778, 781-82 (Va. 2000); *Pamela B. v. Ment*, 709 A.2d 1089, 1106 (Conn. 1998); *Glassman v. Glassman*, 131 N.E.2d 721, 723 (N.Y. 1956); *Central Collection v. DLD*, 685 A.2d 873, 875 (Md. Ct. Spec. App. 1996); *cf. Opinion of the Justices*, 126 N.H. 554, 559-60 (1985) (identifying four considerations supporting continuation of the doctrine of sovereign immunity).

As we have noted, the Estate does not seek money from the State Treasury, so there is no need to bar the action in this case "to protect the public against profligate encroachment on the public treasury." Furthermore, there is no threat that the orderly administration of government will be disrupted by individuals seeking release from a Medicaid lien. In such cases, individuals will not be seeking an indeterminate amount of money from the State Treasury in the form of damages, but, rather, will essentially seek to bar the State from collecting money that the State has already collected from the tobacco defendants.

## B. Assignment

We turn now to the Estate's argument that the probate court erred in ruling that the monetary settlement made pursuant to the MSA did not satisfy the State's lien against the Estate. The State argues that the tobacco litigation involved a direct action relating to damages sustained by the State as a result of actions by the tobacco companies, not an assigned cause of action. Therefore, none of the proceeds of the settlement are allocable to expenditures made on Raduazo's behalf, and none may be credited to the lien on her estate. Resolution of this issue turns upon an interpretation of the nature and scope of both the assignment of rights made to the State pursuant to statute, and the release of claims made pursuant to the MSA.

RSA 167:14-a provides, in pertinent part:

I. Any person who is a recipient of financial assistance, medical assistance, old age assistance or aid to the permanently and totally disabled shall, by his acceptance of such assistance, be deemed to have assigned any claim or right of action against any person or party to the commissioner of health and human services, to the extent that such assistance is furnished.

II. Whenever a recipient of financial assistance, medical assistance, old age assistance or aid to the permanently and totally disabled shall have a legally cognizable claim against any person or party for expenses or support and the

department of health and human services has already furnished assistance to such recipient, the amount of assistance furnished may be recovered in an action brought in the name of the state from such person or party against whom the recipient has a legally cognizable claim of expenses or support.

III. The state medical assistance program is the payer of last resort and shall provide medical coverage only when there are no other available resources. Whenever a recipient of medical assistance shall receive a settlement or an award from a liable third person or party, such recipient shall repay the amount of medical assistance furnished by the state to the extent that the amount of the recovery makes repayment possible.

■ The effect of paragraph I is to provide, by operation of law, that when a Medicaid recipient receives money from the State, the recipient assigns his or her claims against potential third parties to the State, to the extent of the Medicaid payments received. Although paragraph III suggests that the recipient may not be divested of his or her right immediately upon receipt of benefits, common sense dictates that once the State, as assignee, exercises the right and obtains a settlement or judgment based upon it, the assignor is divested of the right, and the assignor's claim is extinguished. Thus, a key question in this case is whether the State, in fact, exercised Raduazo's rights when it sued, and obtained a settlement from, the tobacco companies.

■ We conclude that the State's litigation against the tobacco companies was based, at least in part, upon Raduazo's statutorily assigned right to recover medical expenses from a liable third party. The tobacco litigation petition stated, in part:

3. Citizens of the state of New Hampshire have suffered because of, and the State has incurred expenses related to, the use of tobacco in New Hampshire. New Hampshire citizens have become ill and died from tobacco-related diseases. The State has expended and continues to expend millions of dollars annually in Medicaid payments and other State-funded programs to provide funds for the diagnosis and treatment of tobacco-related illnesses.

The petition also requested that the court "award[] monetary relief ... including but not limited to ... the State's costs under the Medicaid program of providing medical care related to tobacco use." Furthermore, in the MSA, the State released any and all claims it had against the tobacco companies whether such claims were held directly or derivatively. As one court noted, "The settlement agreement releases the tobacco

defendants from liability for state-paid medical expenses, i.e., expenses paid by the medical- and general-assistance programs." *Brown v. State*, 617 N.W.2d 421, 425 (Minn. Ct. App. 2000), *cert. denied*, 532 U.S. 995 (2001).

Under the settlement agreement, the State stepped into the shoes of the Medicaid recipients and obtained a settlement based upon their rights. In doing so, the State divested the Medicaid recipients suffering from tobacco-related illnesses of their right to pursue health care costs that were covered by the State's medical assistance programs and to recover damages in the amount of the medical expenses paid on their behalf. That the MSA may not bar Medicaid recipients from bringing claims against the tobacco companies for other damages, such as pain and suffering, lost wages or earning capacity, *Brown*, 617 N.W.2d at 427, does not alter our conclusion. To bar the Estate from demonstrating that the payments made pursuant to the MSA were made, in part, to reimburse the State for monies paid through the Medicaid program on Raduazo's behalf would effectively permit the State to collect the amount of money to which it is entitled twice, and unjustly enrich the State at the expense of the Estate.

We recognize, as the State points out, that neither the decedent nor her Estate was a named party in the tobacco litigation. The statute, however, authorizes the State to bring a subrogation action "in the name of the state from such person or party against whom the recipient has a legally cognizable claim of expenses or support." RSA 167:14-a, II. We also recognize, as the State points out, that the State's tobacco litigation "went far beyond any personal cause of action attributable to the decedent or any other Medicaid recipient," but conclude that the litigation encompassed a claim for payments made to Medicaid recipients arising from recipients' assigned causes of action.

The probate court concluded, and the State argues on appeal, that the State sought damages only for those "unreimburseable payments" made by it through the Medicaid program, and that because the payments made to Raduazo are reimburseable (at least in part) through the estate lien, the payments were not recovered in the tobacco settlement. Neither the probate court nor the State has pointed to any language in the State's petition in the tobacco litigation or the MSA to support such an interpretation. Nor have we been able to find any.

We also disagree with the State that our ruling that the tobacco litigation was predicated, in part, upon assigned claims will "stand in stark contrast to the courts nationwide that have denied Medicaid recipients any direct right to the MSA proceeds." The plaintiffs in each of the cases cited by the State were Medicaid recipients who argued that they had a right to that portion of the settlement that exceeded the States' actual medical

expenses pursuant to a federal statutory framework governing a State's distribution of any recovery on a third-party claim assigned by a Medicaid recipient. *See, e.g., Strawser v. Atkins*, 290 F.3d 720, 727-28 (4th Cir. 2002); *Greenless v. Almond*, 277 F.3d 601, 605 (1st Cir. 2002); *McClendon v. Georgia Dept. of Community Health*, 261 F.3d 1252, 1255 (11th Cir. 2001); *Harris v. Owens*, 264 F.3d 1282, 1285-87 (10th Cir. 2001), *cert. denied*, 122 S. Ct. 2294 (2002); *Tyler v. Douglas*, 280 F.3d 116, 117-18 (2d Cir. 2001), *cert. denied*, 122 S. Ct. 2361 (2002); *Watson v. Texas*, 261 F.3d 436, 439 (5th Cir. 2001); *Floyd v. Thompson*, 227 F.3d 1029, 1032, 1035 (7th Cir. 2000); *Skillings v. Illinois*, 121 F. Supp. 2d 1235, 1236 (C.D. Ill. 2000); *Brown*, 617 N.W.2d at 423; *State of California v. Superior Ct.*, 99 Cal. Rptr. 2d 735, 738 (Ct. App. 2000).

The federal statute at issue in the above-cited cases governs a State's distribution of a recovery on a third-party claim assigned by a Medicaid recipient. Pursuant to the statute, payments go first to a State to satisfy its relevant Medicaid expenses, then to the federal government to satisfy its relevant Medicaid expenses, and then to the patient who assigned the claim. *See* 42 U.S.C.A. § 1396k(b) (1992); *see also* 42 C.F.R. § 433.154 (2001). According to the class-action plaintiffs in the above-cited cases, the tobacco settlement constituted a Medicaid recovery subject to this scheme. Therefore, they asserted that state officials were required by the statute to distribute to them the "excess" funds recovered under the settlement.

All of the courts dismissed the claims, but provided different rationales for doing so. Some courts held that the MSA only settled claims for money the State actually expended to provide medical services to recipients of public aid, and that because a recipient would not be entitled to money expended on his or her behalf, the recipient has no claim to any portion of the settlement proceeds. *See McClendon*, 261 F.3d at 1261; *Floyd*, 227 F.3d at 1036; *Skillings*, 121 F. Supp. 2d at 1237-38; *Brown*, 617 N.W.2d at 426-27. Those courts generally reasoned that the MSA did not bar individual Medicaid recipients from pursuing the tobacco defendants to recover for their own alleged injuries. Because the only money the State recovered was what it paid to cover the medical expenses of the Medicaid recipients, and because the recipient had no claim to this money, there was "nothing in the [settlement agreement] to which the plaintiffs may assert a claim." *McClendon*, 261 F.3d at 1261 (quotation omitted). The reasoning of these cases is not inconsistent with our holding that because the MSA settled claims for money the State *actually expended* on Medicaid, the State is barred from collecting that money a second time from the recipient's estate.

Other courts have held that a 1999 amendment to the federal Medicaid statute rendered the federal statutory framework governing a State's

distribution of any recovery on a third-party claim assigned by a Medicaid recipient inapplicable to the tobacco settlement. *See Strawser*, 290 F.3d at 732; *Greenless*, 277 F.3d at 608; *Harris*, 264 F.3d at 1294-95; *Tyler*, 280 F.3d at 121-24. Regardless of the reasoning set forth in these cases, they do not apply. In this case, the Estate is not seeking a portion of the tobacco settlement in excess of the amount the State paid to Medicaid recipients for tobacco-related illnesses pursuant to the federal statutory scheme. Only two courts, whose reasoning on this issue we find unpersuasive, rejected the plaintiffs' claims on the grounds that no part of the tobacco litigation was premised upon an assignment of rights. *See Watson*, 261 F.3d at 444; *State of California*, 99 Cal. Rptr. 2d at 740-42.

The State argues that even if Raduazo suffered injuries caused by smoking tobacco products and that the State pursued assigned causes of action, the probate court properly dismissed the Estate's petition because there is no evidence in the record to date regarding the extent to which the State's Medicaid payments to Raduazo were associated with tobacco-related illness, whether her illness or disease was caused by smoking, or the nexus connecting her tobacco use with the tobacco defendants who are parties to the MSA. Because the probate court did not address this issue, we decline to consider it.

For the foregoing reasons, we reverse the probate court's ruling dismissing the Estate's petition and remand for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

NADEAU and DALIANIS, JJ., concurred; DUGGAN, J., dissented.

DUGGAN, J., dissenting. Because I conclude that the probate court was correct in ruling that the monetary settlement made pursuant to the MSA did not satisfy the State's lien against the Estate, I would affirm that court's decision and not reach the sovereign immunity issue.

The State argues that the tobacco litigation involved a direct action relating to damages sustained by the State as a result of actions by the tobacco companies, not a subrogation action brought to enforce those rights Raduazo assigned to the State pursuant to RSA 167:14-a. Therefore, the State argues, none of the proceeds of the settlement are allocable to expenditures made on Raduazo's behalf, and none may be credited to the lien on her estate. Resolution of this issue turns on an interpretation of the nature of the State's action against the tobacco companies.

The issue is whether the State brought suit against the tobacco companies in a subrogation action, or whether the State sued independently for the financial harms that it has suffered as a consequence

of the tortfeasors' actions, because if the State brought the action in subrogation, then the State stepped into Raduazo's shoes to enforce a right she would have enjoyed had she decided to bring suit. *See McCullough v. Company*, 90 N.H. 409, 411 (1939) (superseded by statute on other grounds); *see also* 73 AM. JUR. 2D § 1 *Subrogation* (2001). If this were the case, then the State necessarily exercised Raduazo's rights when it sued and obtained a settlement from the tobacco companies. *McCullough*, 90 N.H. at 411. Under these circumstances, the equities would arguably weigh in favor of precluding the State from enforcing its lien. In such a situation, the State would have divested Raduazo of her claim against the tobacco companies, and would presumptively have recovered the cost of the benefits Raduazo received. Therefore, allowing the State to enforce its lien would arguably permit the State to recover twice the amount of benefits it actually paid to Raduazo.

If, however, the State's action against the tobacco companies was a direct action, then the equities would arguably weigh in favor of allowing the State to enforce its lien. In such a situation, the State would not have divested Raduazo of her claim against the tobacco companies, and would not necessarily have recovered the cost of the benefits Raduazo received.

Whether the MSA settled any subrogated claims the State may have had against the tobacco companies requires consideration of the nature of the claims the State made against the tobacco companies and the scope of the release of claims made pursuant to the MSA. A review of the underlying litigation leads to the conclusion that the State's suit against the tobacco companies was not filed and settled on behalf of smokers like Raduazo, but instead was a direct action filed for the benefit of all citizens whose tax dollars were and will be spent caring for harms that the tobacco industry allegedly caused.

The State filed suit against the tobacco companies in its own name. Neither Raduazo nor her estate was a named party to the litigation. Indeed, the litigation was pursued and settled without any reference to, participation in, or involvement by, any individual Medicaid recipients. The State's petition does not include any reference to any particular assigned causes of action or subrogated claims asserted by the State on behalf of any Medicaid recipients. All of this suggests that the State did not sue the tobacco companies to enforce any rights that individual Medicaid recipients had assigned to it.

This view of the nature of the State's litigation against the tobacco companies is consistent with the view expressed by other courts and commentators that the States sued the tobacco companies directly, and not on behalf of injured smokers. *See Watson v. Texas*, 261 F.3d 436, 444-45 (5th Cir. 2001); *State of California v. Superior Court*, 99 Cal. Rptr. 2d 735,

742 (Ct. App. 2000); *State v. Philip Morris, Inc.*, 686 N.Y.S.2d 564, 567 (Sup. Ct. 1998), *aff'd*, 693 N.Y.S.2d 36 (App. Div. 1999); Jacobson & Warner, *Litigation and Public Health Policy Making: The Case of Tobacco Control*, 24 J. HEALTH POL. POL'Y & LAW 769, 777 (Aug. 1999); Kelder & Daynard, *The Role of Litigation in the Effective Control of the Sale and Use of Tobacco*, 8 STAN. L. & POL'Y REV. 63, 82 (Winter 1997). In deciding to proceed directly, the States hoped to avoid both the need to prove individual causation and the defenses applicable to individual plaintiffs, such as assumption of the risk and comparative fault. According to one commentator:

> In essence, the [tobacco] litigation was designed to circumvent the freedom-of-choice and individual-rights strategies that tobacco attorneys had used to win previous litigation. In the [tobacco] litigation, claims were aggregated at the State level to avoid the blameworthiness problems faced by individual litigants and the need to show individual causation. Consistent with the underlying theory of the case, the state attorneys general attempted to prove their case based on epidemiological studies of the population-based harms caused by tobacco, not by harms to specific individuals. Since the state has no choice but to absorb the Medicaid costs of tobacco-related diseases, and it is the taxpayers, not smokers, who are injured financially, the states argued that the traditional industry defenses raised in individual litigation are irrelevant.

Jacobson & Warner, *supra* at 777 (citation omitted).

The terms of the MSA further support the conclusion that the tobacco litigation was a direct action. While the State released all claims it may have brought against the tobacco companies, the MSA specifically preserves the rights of smokers or their estates to assert their own claims against the tobacco companies. For example, the MSA limits the "releasing parties" to the Settling States and their various subdivisions and constituent institutions. *See* MSA ¶ II(pp); *see also McClendon v. Georgia Dept. of Community Health*, 261 F.3d 1252, 1261 (11th Cir. 2001); *Floyd v. Thompson*, 227 F.3d 1029, 1037 (7th Cir. 2000). "Individual persons under M.S.A. ¶ II(pp)(2)(A) release claims only insofar as they are acting for the state and suing on general injuries, not insofar as they are seeking solely . . . private or individual relief for separate and distinct injuries." *Floyd*, 227 F.3d at 1037 (quotation and ellipsis omitted). Thus, the State did not release claims against any tobacco defendant held by individuals, and did not extinguish the claims of individual persons who

were not part of the settlement process to recover health care expenses paid by the individual. *See id.*

It is true that the State's petition stated that "[t]he State has expended and continues to expend millions of dollars annually in Medicaid payments and other State-funded programs to provide funds for the diagnosis and treatment of tobacco-related illnesses," and requested monetary relief including, "the State's costs under the Medicaid program of providing medical care related to tobacco use." The Medicaid expenditures cited refer, however, to the State's expenditures that arose because of the inability of Medicaid recipients to pay for all expenses associated with their care. These costs do not include costs that recipients, through their estates, are ultimately able to pay, but only, as the probate court concluded, those *unreimburseable* payments made to Medicaid recipients suffering from tobacco-related illnesses. Under this interpretation of the MSA, to the extent that the State collects on its lien from her estate, Raduazo has "paid" for at least some of her own health care expenses, and her estate is entitled to pursue the tobacco companies to recover, among any other claims her estate may have, these expenses.

The majority holds that the State's litigation against the tobacco companies was based in part upon Raduazo's statutorily assigned right to recover medical expenses from a liable third party, and that the Estate should therefore be afforded the opportunity to prove that some portion of the State's lien should be discharged. However, it is unclear what the Estate must prove in order to have the lien discharged. Presumably, at the very least, the Estate must prove that Raduazo's illness was caused by smoking and that there is some connection between her tobacco use and the defendants who are parties to the MSA. Whether the Estate must prove, as the State suggests, that the tobacco companies who are parties to the MSA are liable for her injuries is an issue about which the majority makes no comment. If, in order to prove that some or all of the lien should be discharged, the Estate is required to prove that the State's Medicaid payments on her behalf were associated with tobacco-related illnesses, that the illnesses were caused by smoking, and that the tobacco defendants who are parties to the MSA are liable for her illnesses, then today's decision does nothing more than allow the Estate to prove the same case in an action against the State as it would in an action against the tobacco companies themselves. This seems an odd result, as it would put the State in a position of defending claims the tobacco defendants would be better equipped to defend.

A more difficult question, not addressed by today's decision, is how the probate court is to determine what portion of the lien should be

discharged. As the probate court pointed out, and as is clear from the petition in the underlying tobacco litigation, the State sought damages

> including but not limited to (1) the State's costs under the Medicaid program of providing medical care related to tobacco use; (2) the State's cost of providing to non-medicaid indigent persons medical care related to tobacco use; (3) disgorgement of the pecuniary gain realized by the defendants from wrongful conduct; (4) restitution, civil penalties and attorney's fees pursuant to RSA 358-A:6, IV for alleged consumer protection violations; (5) civil penalties and attorney's fees pursuant to RSA 356:4-a, b, and c for alleged antitrust violations and (6) enhanced damages based on the egregious nature of the tobacco defendants' conduct.

As the probate court pointed out, the MSA does not allocate payments to any specific theory of recovery or relief. Therefore, it is unclear what portion of the settlement payments can be specifically attributed to payments made by the State under Medicaid or other public assistance programs to or for persons with smoking-related diseases.

Even if it were possible to allocate the settlement to specific causes of action and to determine what part is allocable to the Medicaid payments made by the State, the probate court would still need to determine what portion of the settlement allocable to the Medicaid payments are allocable to Raduazo's assigned claim, as opposed to the claims assigned by other Medicaid recipients suffering from tobacco-related illnesses. This task will be further complicated by the fact that the State probably did not collect the full value of the assigned claims, given that payments were made pursuant to a settlement agreement.

Other courts have recognized that allowing Medicaid recipients to benefit from the MSA may create "administrative problems," *Floyd*, 227 F.3d at 1038. There are, of course, many Medicaid recipients who have in the past been required to reimburse the State through execution of a lien or otherwise. Whether those recipients will now be able to recover for the amount of the executed liens remains to be seen. In addition, the MSA covers future claims. Today's holding raises doubts about the State's ability to obtain and execute on future liens for future recipients of Medicaid.

Because the State sued the tobacco defendants in a direct action to recover for the unreimburseable financial harms it suffered, because the MSA specifically preserves the rights of smokers and their estates to assert their own claims against the tobacco companies, and because of the potential impact of today's holding, I would affirm the trial court's decision

to grant the State's motion for summary judgment. Therefore, I respectfully dissent.